**Slip Op. 01-59**

**United States Court of International Trade**

STEEL AUTHORITY OF INDIA, LTD.,
        Plaintiff,

      v.

UNITED STATES,
        Defendant

        and

BETHLEHEM STEEL CORPORATION; U.S. STEEL
GROUP, A UNIT OF USX CORPORATION; IPSCO
STEEL INC.,
        Defendant-Intervenors.

Before: Pogue, Judge

Court No. 00-03-00096

[ITC's final determination is affirmed.]

Decided: May 22, 2001

Wilmer, Cutler & Pickering (John D. Greenwald, Robert C. Cassidy, Jr.) for Plaintiff.

Lyn M. Schlitt, General Counsel; James A. Toupin, Deputy General Counsel; Michael Haldenstein, Office of the General Counsel, U.S. International Trade Commission, Counsel, for Defendant.

Schagrin Associates (Roger B. Schagrin) for Defendant-Intervenor IPSCO Steel Inc.

Skadden, Arps, Slate, Meagher & Flom LLP (Robert E. Lighthizer, John J. Mangan) for Defendant-Intervenor Bethlehem Steel Corporation and U.S. Steel Group, a Unit of USX Corp.

**OPINION**

**Pogue, Judge:**   This action is before the court on Plaintiff's motion for judgment on the agency record pursuant to USCIT Rule 56.2.   Plaintiff, Steel Authority of India, Ltd. ("SAIL"), challenges the final determination of the U.S. International Trade Commission ("Commission" or "ITC") that an industry in the United States is materially injured by reason of imports from India sold at less than fair value ("LTFV").[1]   Certain Cut-to-Length Steel Plate from France, India, Indonesia, Italy, Japan and Korea, USITC Pub. No. 3273, Inv. Nos. 701-TA-387-391 & 731-TA-816-821 (Jan. 2000)(final determ.)("Final Determination").[2]   Specifically, SAIL objects to the Commission's finding that imports from India "compete with each other and with domestic like products" within the meaning of Section 771 of the Tariff Act of 1930, as amended. 19 U.S.C. § 1677(7)(G)(i), (H)(1994); see also Pl.'s Mem. Supp. Mot. J. Agency R. at 2 ("SAIL Brief").   The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(B)(i).

---

[1]Even though SAIL's brief states that it challenges the ITC's determination that an industry in the United States is materially injured by reason of subsidized imports from India, this case involves only a challenge to the ITC's determination of material injury by reason of imports sold at LTFV.

[2]"P.R." refers to "Public Record" and "C.R." refers to the Confidential Record.   All P.R. documents are located in List 1 of the Commission's record and the C.R. documents are contained in List 2.

We conclude that the Commission's choice of a three-year period of investigation for its review of SAIL's presence in the U.S. market is reasonable. We also find substantial evidence in the record to support the Commission's "compete with" finding. Finally, we affirm the Commission's conclusion that imports from India were not negligible. Accordingly, we deny Plaintiff's motion and sustain the Commission's determination.

## Background

On February 16, 1999, Bethlehem Steel Corporation, Gulf States Steel, Inc., IPSCO Steel Inc., Tuscaloosa Steel Corporation, the United Steelworkers of America, and the U.S. Steel Group (collectively "Petitioners"), filed a petition with the Commission and the Department of Commerce ("Commerce") alleging that imports of certain cut-to-length ("CTL") carbon steel plate were being or were likely to be sold in the United States at LTFV and that such imports were materially injuring an industry in the United States.[3] Commerce, on the Petitioners' request, initiated an investigation of imports of CTL carbon steel plate from the Czech Republic, France, India, Indonesia, Italy, Japan, the Republic of Korea, and the Former Yugoslav Republic of Macedonia. <u>Initiation of Antidumping Duty Investigations: Certain Cut-To-Length Carbon-Quality Steel Plate From the Czech Republic, France, India,</u>

---

[3]Only Bethlehem Steel Corporation, the U.S. Steel Group, and IPSCO Steel Inc. filed briefs as Defendant-Intervenors in this action.

<u>Indonesia, Italy, Japan, the Republic of Korea, and the Former
Yugoslav Republic of Macedonia</u>, 64 Fed. Reg. 12,959 (Dep't Commerce
March 16, 1999)(initiation notice).

The ITC, on February 10, 2000, issued its finding that an
industry was materially injured by reason of dumped and subsidized
imports from France, India, Indonesia, Italy, Japan, and Korea.
<u>See</u> <u>Certain-Cut-to-Length Steel Plate From the Czech Republic,
France, India, Indonesia, Italy, Japan, and Korea</u>, 65 Fed. Reg.
6,624 (Dep't Commerce Feb. 10, 2000).  In the course of its
analysis, the ITC determined that imports from India should be
cumulated with imports from the other named countries in order to
appropriately identify their effect on the domestic industry.  <u>See</u>
Final Determination at 18.[4]  As required by the statute, the ITC
found that the imports from India "compete[d] with each other and
the domestic like product" during the period of investigation.[5]

_____

[4]The Commission's preliminary determination excluded subject
imports of certain CTL steel plate from the Czech Republic and
Macedonia on the basis that they were negligible. <u>See</u> <u>Certain
Cut-To-Length Steel Plate from the Czech Republic, France, India,
Indonesia, Italy, Japan, Korea and Macedonia</u>, USITC Pub. No.
3181, Inv. Nos. 701-TA-387-392 & 731-TA-815-822, at 13-14 (April
1999)(prelim. determ.).

[5]The relevant portions of the statute provide:

    (G) Cumulation for determining material injury.

        (i)   In general. For purposes of clauses (i) and
              (ii) of subparagraph (C), and subject to
              clause (ii), the Commission shall cumulatively
              assess the volume and effect of imports of the
              subject merchandise from all countries with
              respect to which--

        (I) petitions were filed under section

Id.; 19 U.S.C. § 1677(7)(G)(i).


## Standard of Review

The court will sustain the ITC's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ."  19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951); Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938).  It is not the function of the court to reweigh the evidence or to impose its own reasoning on the agency, even if the court would have reached a different conclusion.  See Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 619-20 (1966).

---

1671a(b) or 1673a(b) of this title on the same day,

(II) investigations were initiated under section 1671a(a) or 1673a(a) of this title on the same day, or

(III) petitions were filed under section 1671a(b) or 1673a(b) of this title and investigations were initiated under section 1671a(a) or 1673a(a) on the same day,

if such imports compete with each other and with domestic like products in the United States market.

19 U.S.C. § 1677(7)(G)(i).

**Discussion**

**A.    Cumulation Analysis**

**1.    Statutory Interpretation**

The Tariff Act of 1930, as amended, directs the ITC "to make a final determination of whether . . . an industry in the United States . . . is materially injured . . . by reason of [subject] imports, or sales . . . for importation[.]"  19 U.S.C. § 1673d(b)(1994).  In order to show that the material injury occurred "by reason of" the subject imports, the ITC is required to show a causal connection between the subject imports and the material injury.  See Gerald Metals, Inc. v. United States, 132 F.3d 716, 722 (Fed. Cir. 1997).  When establishing such a nexus, the Commission considers:  "1) the volume of [the subject] imports, 2) the effect of [the subject] imports on prices of like domestic products, and 3) the impact of [the subject] imports on domestic producers of like products."  USX Corp. v. United States, 11 CIT 82, 84, 655 F. Supp. 487, 489 (1987).[6]

The statute further requires the Commission to "cumulatively assess the volume and effect of imports of like products from all countries as to which" petitions were filed, or as to which investigations were self-initiated by Commerce, on the same day, if

---

[6]19 U.S.C. § 1677(7)(B)(ii) provides, in relevant part, that the Commission "may consider such other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports."  19 U.S.C. § 1677(7)(B)(ii).  None of the factors are determinative; rather, the Commission evaluates all relevant economic factors "within the context of the business cycle and conditions of competition that are distinctive to the affected industry."  19 U.S.C. § 1677(7)(C)(iii).

such imports "compete with each other and with domestic like products in the United States market."  19 U.S.C. § 1677(7)(G)(i). Cumulation allows the ITC to "consider the impact of imports from more than one country on the domestic industry . . . ."  Goss Graphic Sys., Inc. v. United States, 22 CIT __, __, 33 F. Supp. 2d 1082, 1085-86 (1998), aff'd, 216 F.3d 1357 (Fed. Cir. 2000).  This analysis "recognizes that a domestic industry can be injured by a particular volume of imports and their effects regardless of whether those imports come from one source or many sources." Statement of Administrative Action ("SAA"), H.R. Rep. No. 103-826, at 847 (1994), accompanying the Uruguay Round Agreements Act.[7] The ITC determines whether there is a reasonable indication that cumulated imports cause or threaten to cause material injury in the market.  See 19 U.S.C. § 1677(7)(G).

The settled practice of the Commission, approved by this court, is to make its "compete with" determination by considering the products' fungibility, the similarity of their geographic markets, the channels of distribution, and their simultaneous presence in the market.  See Fundicao Tupy S.A. v. United States, 12 CIT 6, 10-11, 678 F. Supp. 898, 902 (1988), aff'd, 859 F.2d 915 (Fed. Cir. 1988).  These factors, however, are neither exclusive nor determinative.  See Goss Graphic Sys., Inc., 22 CIT at __, 33 F. Supp. 2d at 1086 (internal citations omitted).  Although

---

[7]The SAA is "an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

"[c]ompletely overlapping markets are not required" to satisfy the "compete with" element, the Commission must determine that "a 'reasonable overlap' [of] competition" exists between imports from different countries.  <u>Wieland Werke, AG v. United States</u>, 13 CIT 561, 563, 718 F. Supp. 50, 52 (1989); <u>Florex v. United States</u>, 13 CIT 28, 38, 705 F. Supp. 582, 592 (1989).

SAIL contends that the Commission, in the course of its cumulation analysis, misconstrued the "compete with" clause in section 1677(7)(G)(i).  SAIL argues that both the text and the structure of the statute preclude the Commission from using the full period of investigation when making its cumulation determination.  <u>See</u> SAIL Brief at 10.  Instead, SAIL claims that the plain meaning of the statute requires the ITC to apply the "compete with" provision as limiting the time frame for cumulation to the period of material injury.[8]  <u>Id.</u> at 10-11 (citing Black's Law Dictionary 284 (6th ed. 1990)); <u>see also</u> 19 U.S.C. § 1677(7)(G)(i), (H).  SAIL argues that the use of the present tense in the statute is strong linguistic evidence of Congressional

---

[8]SAIL relies on evidence from the petition indicating that the industry experienced a financial decline beginning in the fourth quarter of 1998.  <u>See</u> SAIL Brief at 4 n.2, 5 n.6.  Based on this data, SAIL suggests a "period of injury" from July 1, 1998 through June 30, 1999. <u>Id.</u> at 3.  Although SAIL argues that the Commission found that material injury occurred at a specific time, the Commission never made such a finding.  Rather, the Commission "relied on declining financial indicators over the whole period of investigation [,]" Def.'s Mem. Opp'n to Mot. J. Agency R. at 11, and found "significant underselling from 1996 through the first half of 1999."  Report, Views of Commission, C.R. Doc. No. 197 at 35 (Feb. 3, 2000) ("Comm. Report").

intent to limit cumulation to presently competing imports; that is, to the period of material injury.[9]  See SAIL Brief at 11.

The determination of whether the agency's statutory interpretation is in accordance with law follows the two-step analysis formulated in Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).  The first step is to investigate as a matter of law "whether Congress's purpose and intent on the question at issue is judicially ascertainable." Timex V.I., Inc. v. United States, 157 F.3d 879, 881 (Fed. Cir. 1998).  "To ascertain whether Congress had an intention on the precise question at issue, [the court] employ[s] the 'traditional tools of statutory construction.'" Id. at 882 (citing Chevron, 467 U.S. at 843 n.9).  The first tool of statutory construction is the plain meaning of the text, which is the final expression of Congress's intent.  See id.  Beyond the statute's text, the tools of statutory construction include the statute's legislative history, the statute's structure, and the canons of statutory construction.  See id.  (citing Dunn v. Commodity Futures Trading Comm'n, 519 U.S. 465, 469-78 (1997)).  If the statute is clear, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of

---

[9]SAIL's interpretation of the statute uses the present continuous tense; i.e., as contemplating an action that is not completed or finished at the time.  This interpretation would limit the ITC's cumulation to on-going competition that will end in the future. As such, SAIL's interpretation would exclude all imports that are not in competition during the period of alleged injury, even though these imports were present and competing with other like domestic and imported products throughout the entire period of investigation.

Congress."  <u>Chevron</u>, 467 U.S. at 842-43.

If, after employing the first prong of <u>Chevron</u>, the court concludes that the statute is ambiguous with respect to the specific issue, the court proceeds to the second step.  <u>See id.</u>  In the second step of the <u>Chevron</u> analysis, the narrow legal question is whether the agency's statutory interpretation is a permissible construction of the statute.  <u>See id.</u>  The court must defer to Commerce's reasonable interpretation.  See <u>Koyo Seiko., Ltd. v. United States</u>, 36 F.3d 1565, 1573 (Fed. Cir. 1994).

Contrary to SAIL's argument and despite the use of the present tense, the phrase "compete with" does not have a plain meaning. The only statutory mandate is to cumulate subject imports in cases where "imports compete with each other and with domestic like products" in the U.S. market.  19 U.S.C. § 1677(7)(G)(i).  The statute does not specify a precise time period which the Commission must consider in making its cumulation decision.  Moreover, the statute fails to define the phrase at issue.

The legislative history of this provision, first added in 1984, also does not provide any indication of what Congress intended by the phrase, and provides limited explanation as to its purpose.  <u>See</u> Pub.L. No. 98-573 § 612, 98 Stat. 2948, 3033; <u>see also</u> <u>Ranchers-Cattlemen Action Legal Foundation v. United States</u>, 23 CIT __, __, 74 F. Supp. 2d 1353, 1370 (1999).  Cumulation was created as a tool to "eliminate inconsistencies in Commission practice and to ensure that the injury test adequately addressed <u>simultaneous unfair</u> imports from different countries." <u>Ranchers-Cattlemen</u>, 23 CIT at __, 74 F. Supp. 2d at 1370 (emphasis

added)(quoting House Comm. on Ways and Means, Trade Remedies Reform Act of 1984, H.R. Rep. No.98-725, at 37 (1984)).  Use of the word "simultaneous" is also unhelpful in ascertaining the intended meaning of the "compete with" phrase because it does not define the length of time over which simultaneous presence is required.

As neither the language of the statute nor the legislative history is conclusive, we review the Commission's interpretation of the statute for reasonableness.  See Chaparral Steel Co. v. United States, 901 F.2d 1097, 1104 (Fed. Cir. 1990)("Because neither the statutory language nor the legislative history conclusively establishes the intended time frame for cumulation, we assess the agency's interpretation of the provision to determine whether it is reasonable and in accordance with the legislative purpose."); see also Corning Glass Works v. United States Int'l Trade Comm'n, 799 F.2d 1559, 1565 (Fed. Cir. 1986).  We hold that the Commission reasonably interpreted the "compete with" provision in choosing a three-year period of investigation for its review of SAIL's presence in the U.S. market.[10]

This court has consistently held that the Commission has broad discretion in choosing the time frame for its investigation and analysis.  See British Steel Corp. v. United States, 8 CIT 86, 93,

---

[10]We defer, in this case, to the Department's interpretation of the statute because it is reasonable.  Moreover, for the reasons set forth in the text of the opinion, we also find that the Department's interpretation is persuasive and, therefore, "entitled to respect" under the less deferential standard set forth in Skidmore.  See Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944); Christensen v. Harris County, 120 S. Ct. 1655, 1663 (2000).

593 F. Supp. 405, 411 (1984); <u>American Spring Wire Corp. v. United States</u>, 8 CIT 20, 26, 590 F. Supp. 1273, 1279 (1984), <u>aff'd</u> <u>sub. nom.</u>, <u>Armco Inc. v. United States</u>, 760 F. 2d 249 (Fed. Cir. 1985). Generally, the Commission's practice, followed here, is to conduct an annual analysis of the volume and effects of imports over the period of investigation. <u>See</u> <u>Wieland Werke</u>, 13 CIT at 567, 718 F. Supp. at 55.

The ITC explained that its use of the period of investigation was based on its interpretation of the term "compete." The ITC determined that "compete" was to be used in the simple present tense. The simple present tense of "compete" refers to a state rather than an on-going action. In this view, the phrase "imports compete with" refers to the state of the subject imports, broadening the scope of the cumulation provision to include imports that "compete" during the time of investigation.

SAIL argues that the time period used by the ITC distorts the presence of SAIL's imports because SAIL voluntarily withdrew from the market, and its sales during the period of injury were minimal. SAIL rightfully argues that a one-time sale does not establish the presence of imports throughout an entire period. <u>See</u> SAIL Brief at 15-16.[11] Nonetheless, it is precisely for this reason that it was reasonable for the ITC to conduct a more extensive review. The longer review period enabled the ITC to assess SAIL's level of

---

[11]SAIL admits to importing CTL steel plate in July 1998, but submits that its level of imports after that date dropped to such low levels that it cannot be said to be present during this period. <u>See</u> SAIL Brief at 13.

presence and adequately address unfair imports from SAIL.  See Wieland Werke, 13 CIT at 567, 718 F. Supp. at 55.[12]

Subsequent Congressional inaction provides additional support for the conclusion that the Commission's interpretation was reasonable.  Congress amended section 1677 on numerous occasions since its inception, continually electing to ignore questions raised with respect to establishing a specific time frame.[13]  See e.g., Chaparral Steel Co., 901 F.2d at 1105-06.  This silence may be fairly characterized as communicating Congressional intent to grant the Commission the discretion to choose a specific time frame.  See id.  Although Congress's inaction is only one factor, it provides this court with an additional ground to defer to the ITC's interpretation.  See NLRB v. Bell Aerospace Co., 416 U.S. 267, 275 (1974)("[C]ongressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.").

Consequently, the ITC's interpretation of the "compete with" clause as granting the agency the discretion to choose the three-

---

[12]In American Spring Wire Corp., the court rejected the plaintiff's argument that the ITC should have focused on recent quarters in its review, instead of an annual time frame.  See American Spring Wire Corp., 8 CIT at 26, 590 F. Supp. at 1279. The court reasoned that the cumulation statute does not preclude the ITC from conducting an annual analysis where quarter by quarter fluctuations would distort the accuracy of a long term analysis.  See id. ("But the ITC is not required by the statute to use any particular time frame for its analysis . . . .").

[13]Congress amended section 1677 of the Tariff and Trade Act in 1986, 1988, 1990, 1993, 1994 and in 1996.  None of these amendments addresses or limits the ITC's discretion in choosing an appropriate time frame.

year period of investigation as the appropriate time frame for its investigation and assessment of the level of imports from India, is reasonable and thus in accordance with law.

### 2.    Evidentiary Analysis

In the second part of its argument, SAIL objects to the Commission's determination of the last factor of the "compete with" test; that is "whether the imports are simultaneously present in the market."  SAIL Brief at 8-12.[14]  SAIL submits that the ITC's finding of "simultaneous presence" is based on erroneous factual premises.  SAIL argues that it voluntarily withdrew from the market from July 1998 through June 1999; i.e., the period of alleged injury.  See id. at 5.  SAIL also submits that most of its imports from July 1, 1998, to June 30, 1999, were pre-sold prior to the products' entries into the United States, and thus should not be counted for purposes of the ITC's analysis.[15]  See id. at 9 n.23.

The Commission's finding of simultaneous presence relies on an aggregate of indicators.  In determining simultaneous presence, the

---

[14]SAIL does not contest the Commission's determinations as to the three other factors of the "compete with" test.  Because no one factor is determinative, see Goss Graphic Sys., Inc., 22 CIT at __, 33 F. Supp. 2d at 1086, it is not clear that SAIL's motion even states an adequate claim on its face.  Regardless, the Commission's findings on all four factors support the cumulation of imports from India.

[15]SAIL indicates that it imported fewer than 20,000 short tons of CTL steel plate during the second half of 1998 and the first half of 1999 that were not presold, accounting for less than three percent of all imports during the said period.  See Prehearing Brief on Behalf of Steel Authority of India, Ltd., C.R. Doc. No. 36 at 15 n.31 (Dec. 8, 1999)("SAIL Prehearing Brief").  According to SAIL, the amount of CTL steel plate imports from India were so few, that the Commission could not have found simultaneous presence with the other subject imports.

Commission evaluated the extent to which subject imports from the named countries were present in the market during the three-year period of investigation, January 1996 through June 1999.  Subject imports from India, according to the Commission's findings, were present during the entire period of investigation, and in fact entered the United States in seventeen out of eighteen months between January 1998 and June 1999.   See Final Determination at 12.

The Commission also specifically evaluated SAIL's assertions concerning the timing and level of its imports during the claimed period of injury.  The record shows almost 50,000 short tons of CTL steel plate reported by SAIL during the second half of 1998, more than a third of the amount imported by SAIL for the year.  See Final Determination at 18  n.95 (internal citations omitted).  SAIL claims that most of these imports were pre-sold during the first half of 1998.  The information contained on the record establishes that almost 30,000 short tons of CTL steel plate were sold in July 1998 and then shipped during the second half of that year.  See SAIL Prehearing Brief, at 9.  SAIL also admits that, in addition to the July sales, it sold almost 15,000 short tons of CTL steel plate in the second half of 1998.[16]  See id.  This evidence supports the Commission's finding that the majority of sales delivered during the second half of 1998 were contracted during the same period.

---

[16]Although SAIL claims that it withdrew from the market in the second half of 1998, SAIL's own data for this period demonstrates that it sold and shipped a majority of its second half imports during the same period.  See Comm. Report at 26 n.95.   The only possible ground for finding that SAIL's imports were not present in the second half of 1998 would be to include the July 1998 sales in the first half of the year.  Such a claim is without merit as it would provide a distorted view of SAIL's presence.

The record shows that only a minor percentage of CTL steel imports for the year were sold in the first half of 1998 and shipped in the second half.  See SAIL's Prehearing Brief, Annex C, at 1 (Affidavit of Ilona Menzel).  Therefore, most of the imports present during the period of time at issue were actually sold and imported into the United States throughout the second half of 1998.

Several other indicators support a finding that imports of CTL steel plate from India were "simultaneously present" during the period of investigation.  While the ITC recognized that SAIL limited its imports during 1999, it noted that the total value of sales from India increased during the period in controversy.  The value of subject imports from India totaled $50.3 million dollars in 1998, an increase from $12.8 million in 1996 and $45.1 million in 1997.  See Staff Report to Comm., Inv. Nos. 701-TA-387 & 731-TA-816-821, USITC Pub. No. 3272, C.R. Doc. No. 10 at Table IV-5a (Jan. 4, 2000)("Staff Report").  The ITC also found that during the period of investigation CTL steel plate from India entered the U.S. market at an increased rate.  Records show entries made in five months of 1996, seven months of 1997, eleven months of 1998 and the first six months of 1999.  See Staff Report at IV-12.  SAIL's imports were, therefore, present in the marketplace at the same time as those from the other named countries in the investigation. Accordingly, the Commission's determination that SAIL's imports were present in the market during the claimed period of injury is supported by substantial evidence on the record.


**B.   Negligibility Analysis**

   **1.   Statutory Interpretation**

The Uruguay Round Agreements Act mandates the termination of

the cumulation of all subject imports that are negligible.  See SAA, at 849; see also 19 U.S.C. § 1677(7)(G)(ii).  Imports are negligible if they account for three percent or less of the volume of all such products in the U.S. market.  See 19 U.S.C. § 1677(24)(A)(i).  SAIL argues that the ITC erred as a matter of law in holding that its imports exceeded a negligible amount of all imports.  See SAIL Brief at 3-4.  According to SAIL, the ITC erred by using data from the twelve months prior to the initiation of the investigation when conducting its negligibility analysis.  SAIL argues that the ITC is instead required, for negligibility purposes, to analyze data during the period of material injury, which SAIL defines as July 1, 1998, to June 30, 1999.  Id.

As previously discussed, whether the court will defer to the agency's interpretation of the statute is a question of law requiring a thorough investigation of congressional intent.  See Chevron at 842-43.  "[T]he court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  See id. at 843.

SAIL's arguments for its chosen period of time for the negligibility analysis are without merit.  Section 1677(24)(A)(i) specifies that imports from a country shall be considered "negligible" if, with certain exceptions not relevant here, "such imports account for less than 3 percent of the volume of all such merchandise imported into the United States in the most recent 12-month period for which data are available that precedes" the filing of the petition or initiation of the investigation.  19 U.S.C. § 1677(24)(A)(i).  Thus, the statute precisely specifies the applicable time period from which the agency is to collect data for

negligibility purposes.[17]

Here, the petition was filed on February 16, 1999, and the ITC, consistent with its statutory mandate, considered the most recent twelve month period for which data was available preceding the filing of the petition, in this case calendar year 1998. See Final Determination at 13 n.62. The time period used by the ITC is, therefore, in accordance with the law.[18]

**2.   Evidentiary analysis**

In addition, SAIL submits that the Commission's finding with respect to the negligibility of CTL steel plate imports from India is not supported by substantial evidence. SAIL argues that after it voluntarily withdrew from the market, starting in the second half of 1998, its level of imports fell below the three percent threshold.

The ITC used data from the twelve months preceding the filing of the petition. During this period, the ITC's analysis, using two methods of computation, revealed that imports from India

---

[17]This is further evidenced by the legislative history of the provision. See S. Rep. 103-412, at 57 (1994)("The new provision requires the ITC to measure negligibility based on import data available for the most recent 12 month period preceding the filing of the petition or the self-initiation of an investigation.")(emphasis added).

[18]Further, nothing in the WTO Antidumping Agreement requires otherwise. While the Agreement does require that there shall be "immediate termination" of investigations where the ITC determines that the volume of dumped imports is negligible, the Agreement does not specify a period for the negligibility analysis. See Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994, at Art.5.8. As such, there is no conflict between the U.S. statute and the WTO Antidumping Agreement.

represented 6.4 percent and 6.1 percent, respectively, of the total imports.[19]   See Def.-Int. Mem. Opp. Pl.'s Mot. J. Agency R. at 4 (citing <u>Certain Cut-To-Length Steel Plate from Czech Republic, France, India, Indonesia, Italy, Japan, Korea, and Macedonia</u>, Invs. No. 701-TA-387-392 & 731-815-822, Prelim. Staff Report, P.R. Doc. No. 174 at IV-8 (March 26, 1999))(filed by IPSCO Steel Inc.).  As previously discussed, the ITC also found that more than 40,000 short tons of CTL steel plate from India were sold in the second half of 1998.  Therefore, the Commission's decision not to exclude India from its cumulation analysis was based on substantial evidence and is otherwise in accordance with the law.

---

[19]The two methods used by the Commission included micro-alloy as well as non-alloy CTL steel plate imports, and accounted for temporary importation under bond ("TIB") and foreign trade zone ("FTZ") entries.  <u>See</u> Comm. Report at 18 n.62.  One method, however, accounted for TIB and FTZ subject imports that were reexported to Canada after transformation, and the other did not.  <u>See</u> <u>id.</u>

## Conclusion

For the foregoing reasons, the court finds that the Commission's decision to cumulate subject imports from India with those of the other named countries, in the ITC's final determination in <u>Certain-Cut-to-Length Steel Plate From the Czech Republic, France, India, Indonesia, Italy, Japan, Korea and Macedonia</u>, Inv. Nos. 701-TA-387-391& 821, USITC Pub. No. 3273 at 13 (Jan. 2000)(final determ.), is sustained.


                                        _____
                                        Donald C. Pogue
                                                Judge


Dated:     May 22, 2001
           New York, New York