Slip Op. 02 - 59

UNITED STATES COURT OF INTERNATIONAL TRADE

- - - - - - - - - - - - - - - - - - - - - x
CO-STEEL RARITAN, INC., GS INDUSTRIES,
KEYSTONE CONSOLIDATED INDUSTRIES, INC., :
and NORTH STAR STEEL TEXAS, INC.,
                                         :

                         Plaintiffs,     :
              v.
                                         :
UNITED STATES INTERNATIONAL TRADE            Court No. 01-00955
COMMISSION,                              :
                         Defendant,
                                         :
              -and-
                                         :
ALEXANDRIA NATIONAL IRON AND STEEL
COMPANY and SIDERURGICA DEL ORINOCO,     :
C.A.,
                                         :
              Intervenor-Defendants.
- - - - - - - - - - - - - - - - - - - - - x

Opinion & Order

[Plaintiffs' motion for judgment on the agency
 record denied in part and granted in part;
 remanded to the International Trade Commission.]

                                    Decided: June 20, 2002

        Collier Shannon Scott, PLLC (Paul C. Rosenthal, Kathleen W.
Cannon, R. Alan Luberda and John M. Herrmann) for the plaintiffs.

        Lyn M. Schlitt, General Counsel, James M. Lyons, Deputy
General Counsel, and Karen Veninga Driscoll, Attorney, United
States International Trade Commission, for the defendant.

        Baker & McKenzie (Kevin M. O'Brien, Thomas Peele and Kristi
K. Hansen) for intervenor-defendant Alexandria National Iron and
Steel Company.

        White & Case LLP (David P. Houlihan, Lyle B. Vander Schaaf,
Frank H. Morgan, Joseph H. Heckendorn and Jonathon Seiger) for
intervenor-defendant Siderurgica del Orinoco, C.A.


        AQUILINO, Judge:  In this action, duly commenced pursuant

to 19 U.S.C. §1516a(a)(1)(C) and 28 U.S.C. §1581(c), the plaintiffs

seek judicial review and reversal of the (preliminary) determination of the International Trade Commission ("ITC") that imports of carbon and certain alloy steel wire rod from Egypt, South Africa and Venezuela that are alleged to be sold in the United States at less than fair value are negligible and therefore that its investigations with regard to those countries be terminated. <u>See</u> Int'l Trade Comm'n, <u>Carbon and Certain Alloy Steel Wire Rod From Brazil, Canada, Egypt, Germany, Indonesia, Mexico, Moldova, South Africa, Trinidad and Tobago, Turkey, Ukraine, and Venezuela</u>, 66 Fed.Reg. 54,539 (Oct. 29, 2001).

The only cause of action pleaded in plaintiffs' complaint is that this termination is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law within the meaning of 19 U.S.C. §1516a(b)(1)(A).  And they have served and filed a motion pursuant to CIT Rule 56.2 for judgment upon the record compiled by the Commission, arguing, among other things, (i) that its reliance upon data that were not available to them preceding the filing of their petition was unlawful; (ii) that the ITC's conclusion that certain imports in question did not exceed in the aggregate seven percent of all imports during the period of investigation selected was erroneous; and (iii) that its determination that imports from Egypt, South Africa and Venezuela would not imminently exceed the statutory negligibility thresholds was arbitrary and capricious.

I

The above-named plaintiffs claim to be domestic producers of the merchandise that is allegedly being imported into the United States at less than fair value and which filed petitions for relief therefrom with the International Trade Administration, U.S. Department of Commerce ("ITA") and with the ITC.  They were filed on August 31, 2001, and drew upon available industry data for the period July 2000 through June 2001.  The effective date for initiation of the Commission's preliminary investigation was thus reported to be August 31st.  See, e.g., Int'l Trade Comm'n, Carbon and Certain Alloy Steel Wire Rod From Brazil, Canada, Egypt, Germany, Indonesia, Mexico, Moldova, South Africa, Trinidad and Tobago, Turkey, Ukraine, and Venezuela, 66 Fed.Reg. 47,036, 47,037 (Sept. 10, 2001).  And, to

> evaluate negligibility, [the ITC] considered official Commerce import statistics for the period August 2000 through July 2001.[37] . . .

> \* \* \*

> [37] . . . [T]he Commission has interpreted the statutory provision regarding the time period that [it] should examine for negligibility purposes to end with the last full month prior to the month in which the petition is filed, if those data are available.

Int'l Trade Comm'n, Carbon and Certain Alloy Steel Wire Rod From Brazil, Canada, Egypt, Germany, Indonesia, Mexico, Moldova, South Africa, Trinidad and Tobago, Turkey, Ukraine, and Venezuela, USITC Pub. 3456, p. 8 (Oct. 2001).  When those data proved available, the

commissioners took this stated approach -- over the protest of the petitioners, which urged the ITC to examine imports from July 2000 to June 2001, the period that was the basis of their petitions. See id., n. 37.  That issue is raised anew by them now herein.

The plaintiffs argue that the data for July 2001 only became available after the petitions had been filed and thus that the Commission's reliance thereon was not in accordance with law. They point to the following provision in the Trade Agreements Act of 1979, as amended:

> **(24) Negligible imports**
>
>  **(A) In general**
>
>   **(i) Less than 3 percent**
>
>    Except as provided in clauses (ii) and (iv), imports from a country of merchandise corresponding to a domestic like product identified by the Commission are "negligible" if such imports account for less than 3 percent of the volume of all such merchandise imported into the United States in the most recent 12-month period for which data are available that precedes--
>
>    **(I)** the filing of the petition under section 1671a(b) or 1673a(b) of this title
>    . . ..

19 U.S.C. §1677(24).

On its face, this legislation is neither ambiguous nor executory.  Nonetheless, the plaintiffs press their position that the ITC "alter[ed]" their timeframe and, in doing so, "reached

different conclusions on negligibility from those set forth in the petition."  Plaintiffs' Brief, p. 20.

> In essence, the question for this court comes down to whether the statutory language referring to "the most recent 12-month period for which data are available that precedes the filing of the petition" means the most recent 12-month period "for which data are available" to the domestic industry <u>preceding</u> the filing of the petition, or "for which data are available" to the Commission <u>subsequent</u> to the filing of the petition, so long as the 12-months of data themselves precede the filing.

<u>Id</u>. at 22 (emphasis in original).  Or, as they articulate elsewhere in their excellent brief,

> the question presented here [is] whether the statutory reference to reliance on data available preceding the filing of the petition permits the Commission to examine data that was [*sic*] not available preceding the filing of the petition.

<u>Id</u>. at 24.  In attempting to resolve the controlling question, however couched, the court accepts plaintiffs' contentions that the statutory requirement that the negligibility calculation be premised on data available preceding the filing of a petition is a logical means of requiring petitioners to ensure that the countries considered as targets for antidumping relief actually surpass the statutory minimum(s) before they are formally charged[1]; that, typically, the most recent data that are available prior to filing will not be for the twelve months immediately preceding that

---

[1] <u>See</u> Plaintiffs' Brief, p. 19.

moment, rather for a 12-month period slightly older in time[2]; that a domestic U.S. industry must determine in good faith whether to include certain countries in any petition for relief from injurious dumping[3]; that such an industry can only base its allegations in a petition on data that are available before its filing, "not on speculation as to possible shifts in imports that might occur sub-sequently"[4]; and that, under article 5.8 of the Uruguay Round Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade[5], negligibility was contemplated as a thres-hold determination to the initiation of a government investiga-tion.[6]

On the other hand, the court cannot concur with other representations by the plaintiffs, including

> [h]ad Congress wanted the Commission to rely on the most recent 12-month period prior to the filing of the petition, as the Commission has interpreted this statu-tory passage, it would not have included the phrase "for which data are available"[7],

and "[t]he Commission's reading of this provision renders th[at] phrase . . . surplusage"[8], and,

---

[2] See id., n. 6.

[3] Cf. id. at 20, 23.

[4] Id. at 23.

[5] April 15, 1994. See H.R. Doc. No. 103-316, vol. 1, p. 1460 (1994).

[6] Plaintiffs' Brief, p. 21.

[7] Id. at 22.

[8] Id.

> [b]y interpreting the statute as it has, the Commission
> has effectively required domestic industries to engage in
> conjecture as to what shifts in imports might occur in
> the month or two for which data are unavailable at the
> time the petition is filed, but which the Commission may
> later rely upon to reach its negligibility decision.
> Under this approach, the domestic industry must undertake
> a speculative filing to the extent it is suffering
> problems from imports with small but, collectively,
> injurious and fluctuating volumes. Rather than requiring
> the domestic industry to assess negligibility based on
> actual data available to it when the petition is filed,
> the Commission's interpretation of the statute would
> promote speculation and risk-taking by domestic producers
> about whether certain countries would or would not be
> found to surpass negligibility thresholds with the addi-
> tion of future import statistics.[9]

Obviously, this slant is too severe. The statute neither promotes

speculation and risk-taking by domestic producers nor permits such

an approach by the ITC. Once a petition gets filed, presumably in

good faith, the burden to assess the salient facts shifts to the

Commission. That process does take some days, during which the

plaintiffs concede that data for a period closer to a petition's

moment of filing may become available in regular course[10] to the

ITC. This is the case at bar, and nothing other than argument by

the plaintiffs stands in the way of reference to such data. The

statute quoted above does not preclude it, nor is there a showing

of a contrary intent on the part of Congress. Indeed, the ante-

---

[9] Id. at 23-24.

[10] Cf. id. at 19, n. 6.

cedent (or subject) of the verb "precedes" is singular, not "data", presuming the legislature like this court is committed to the concept that that noun is the plural of Latin-derived *datum* and therefore could not and did not dictate the foregoing, adopted conjugation. Moreover, plaintiffs' thesis does not explain away the legislated inclusion of "most recent".

Hence, the ITC's statutory responsibility, triggered by plaintiffs' petition, was to determine whether or not imports from any of the countries targeted were "negligible" for a 12-month period[11] before August 31, 2001. In other words, the focus of 19 U.S.C. §1677(24)(A)(i) et seq. is not on the Commission, rather on the most recent year's worth of available data. The ITC reports, USITC Pub. 3456, p. 8, n. 37, that its approach herein was following Large Newspaper Printing Presses and Components Thereof from Germany and Japan, USITC Pub. 2988, p. 23, n. 157 (Aug. 1996) ("since the statute indicates that the period to be used is the twelve-month period preceding the filing of the petition, it is reasonable to conclude that the language of the statute suggests that the 12 month period should end with the last full month prior to the month in which the petition is filed"), and Hot-Rolled Steel Products from Argentina, China, India, Indonesia, Kazakhstan, Netherlands, Romania, South Africa, Taiwan, Thailand, and Ukraine,

---

[11] The record does not confirm that data younger than July 31, 2001 were actually available when the ITC rendered its determination now at bar. Cf. id.

USITC Pub. 3381, p. 7, n. 38 (Jan. 2001) ("The data we have used
. . . are the most recent and accurate data available for a 12-
month period preceding the filing of the petition"), as well as
Steel Authority of India, Ltd. v. United States, 25 CIT ___, 146
F.Supp.2d 900 (2001).  But, as the plaintiffs properly point out
herein, this last matter did not answer their controlling question,
supra, only that the Commission correctly rejected a demand therein
that it consider data available for months *after* the date of that
underlying petition's filing.  Compare Plaintiffs' Brief, p. 24
with 25 CIT at ___, 146 F.Supp.2d at 909-10.

Be these references as they may, this court cannot con-
clude in this action that the ITC's analysis of the issue of
negligibility via data that became available in regular course for
a 12-month pre-petition period one month younger than that relied
upon by the petitioner-plaintiffs was not in accordance with law.

II

Plaintiffs' counsel are astute observers of the shifting
sands of international trade, and they well know that a lawful
advance of even one month in time can alter their equation for
relief.  Nonetheless, they take the position that the Commission's
determination for the period it selected was erroneous, in partic-
ular because it did not properly account for imports from Germany.
That is, the ITC (a) overlooked data revisions of respondents from
that country and (b) refused to consider the impact of a request by

the petitioners that certain steel-wire products not be included in the ITA investigation[12].

The general rule for the Commission has been that it determine, preliminarily within 45 days of a petition's filing, whether there is a "reasonable indication" that an industry in the United States is materially injured, or is threatened with material injury, by reason of imports of the subject merchandise and that those imports are not negligible.  19 U.S.C. §1673b(a).  And the Court of Appeals for the Federal Circuit has long denied that

> the statutory phrase "reasonable indication" means the same as a mere "possibility", or that it suggests "only the barest clues or signs needed to justify further in-quiry."  The statute calls for a reasonable indication of injury, not a reasonable indication of need for further inquiry.

American Lamb Co. v. United States, 785 F.2d 994, 1001 (Fed.Cir. 1986).  Hence, that court has construed this court's standard for review as follows:

> Since the enactment of the 1974 [Trade] Act, ITC has consistently viewed the statutory "reasonable indication" standard as one requiring that it issue a negative deter-mination . . . only when (1) the record as a whole con-tains clear and convincing evidence that there is no material injury or threat of such injury; and (2) no likelihood exists that contrary evidence will arise in a final investigation.  That view, involving a process of weighing the evidence but under guidelines requiring clear and convincing evidence of "*no* reasonable indica-tion", and no likelihood of later contrary evidence, provides fully adequate protection against unwarranted terminations.  Indeed, those guidelines weight the scales

---

[12] The plaintiffs also claim that Indonesia had been part of their equation on negligibility but that imports from that country became a nonfactor as a result of the one-month shift. See Plaintiffs' Brief, p. 20.

in favor of affirmative and against negative determina-
tions.  Under the appropriate standard of judicial
review, ITC's longstanding practice must be viewed as
permissible within the statutory framework.

Id. (emphasis in original).  And the Commission claims to continue
to adhere to this approach today.  See, e.g., Memorandum of
Defendant USITC [herein] *passim*.  Cf. Torrington Co. v. United
States, 16 CIT 220, 790 F.Supp. 1161 (1992), aff'd, 991 F.2d 809
(Fed.Cir. 1993); Ranchers-Cattlemen Action Legal Foundation v.
United States, 23 CIT 861, 74 F.Supp.2d 1353 (1999), appeal dock-
eted, No. 00-1186 (Fed.Cir.  Feb. 3, 2000).  Compare also Usinor
Industeel, S.A. v. United States, 26 CIT ___, ___, Slip Op. 02-39,
p. 25 (April 29, 2002)(the ITC "must apply the common meaning of
'likely' - that is, probable - in conducting . . . sunset review
analyses")(emphasis in original).  Nor do the plaintiffs press for
a different standard in this action.  See, e.g., Plaintiffs' Brief,
p. 15; Plaintiffs' Reply Brief *passim*.  Indeed, the Statement of
Administrative Action ("SAA") promulgated in conjunction with
passage of the Uruguay Round Agreements Act, Pub. L. No. 103-465,
108 Stat. 4809 (1994), is also in accord with this approach.  See
H.R. Doc. No. 103-316, vol. 1, p. 857 (1994).

Notwithstanding this general concurrence, the memorandum
of law filed by the defendant in this action has precipitated a
response by the plaintiffs that the

most fundamental and pervasive flaw evidenced by the
Commission's attempted defense of its negligibility
analysis is its mischaracterization of, and failure to

> apply properly, the standard of review applicable to a
> negligibility determination.  While acknowledging that
> "[i]t has long been established that in applying the
> statutory standard for making a preliminary determination
> regarding material injury or threat of material injury,
> American Lamb provides the evidentiary standard" . . . ,
> the [ITC]'s arguments misapply the American Lamb standard
> . . . and focus instead on assertions that its
> negligibility decision must be sustained because it was
> "reasonable". . . .

Plaintiffs' Reply Brief, p. 1 (citations omitted).

A

The gist of plaintiffs' initial disagreement with respect

to Germany was that the ITC did not pay attention to the written

responses to their petition on behalf of producers of subject

merchandise in that country and that that disregard "has been de-

vastating in this case."  Plaintiffs' Brief, p. 29.  That is, if

the

> Commission, in a final investigation, finds that imports
> from Germany in the August 2000-July 2001 period are
> [negligible], it will terminate the German investigation
> at that time because it will no longer have other
> countries . . . with which to aggregate German imports.
> On the other hand, had the [ITC] faithfully applied the
> standard established in American Lamb, it would have
> continued all of these investigations, finding that it
> could not say there was no likelihood that additional
> evidence contrary to its preliminary conclusions would
> arise in a final investigation on the issue of negligibi-
> lity.  The Commission's failure to properly apply the
> American Lamb standard on this issue justifies a reversal
> of [it]s negligibility decision.

Id. at 29-30.

Plaintiffs' petitions were predicated upon Commerce

Department data.  Not surprisingly, German respondents thereto

sought to downplay the numbers attributed to them.  Irrespective of that attempt, the defendant points out that its staff report explains that the official Commerce Department statistics it relied on were based on imports under certain Harmonized Tariff Schedule subheadings not including the one (7213.99.0060) in the petition which was contested by the German respondents.  Hence,

> [n]o further explanation was necessary, particularly when German Respondent[s] acknowledged at the staff conference that "the tariff categories that are being used to calculate total imports are different than the ones that were alleged [by] the Petitioners."[13]

B

The plaintiffs also complain that the Commission refused to consider the impact of their request that the ITA modify the scope of its investigation, whereupon they argue that it

> failed to apply the standard of review set forth in American Lamb and in the SAA. The American Lamb standard requires a finding that "no likelihood exists that any contrary evidence will arise in a final investigation." . . . Here, the [ITC] was presented with affirmative evidence that an amendment to the scope of the case had been requested and that such an amendment would directly affect the negligibility calculation.  Even if the Commission did not believe that the evidence presented by petitioners was sufficient to justify relying on that evidence as dispositive of the issue, at a minimum it [was] prevented . . . from concluding that "no likeli-hood" exists that evidence contrary to its negligibility conclusion would arise in a final investigation.
>
> The SAA makes clear that Congress did not expect the [ITC] to terminate a case at the preliminary stage of investigation on grounds of negligibility where informa-tion obtained in the final investigation could show that

---

[13] Memorandum of Defendant USITC, p. 31 (footnote omitted). The plaintiffs now accept defendant's position on this particular issue.  See Plaintiffs' Reply Brief, p. 9, n. 9.

> imports exceed the negligibility threshold.  . . .  The
> SAA specifically admonishes the Commission not to
> terminate a case where there is any uncertainty regarding
> like product designations that might lead to a different
> negligibility finding in a final analysis.

Plaintiffs' Brief, pp. 31-32 (citations omitted).  See also Plain-
tiff's Reply Brief, pp. 8-18.

As indicated above, the ITC had 45 days to reach its preliminary determination.  Plaintiffs' petitions were filed on August 31, 2001.  Their letter request to the ITA[14] was forwarded on October 9, 2001, by which date counsel were constrained to "apologize"[15] for its timing.  Indeed, not surprisingly, the ITA did not resolve that request prior to the Commission's statutory deadline.  Hence, the latter was left to consider the matter on the run, and notwithstanding its stated recognition that the ITC "must defer to Commerce's definition of the scope of investigation." Memorandum of Defendant USITC, p. 34, citing USEC, Inc. v. United States, 25 CIT ___, 132 F.Supp.2d 1 (2001); Algoma Steel Corp. v. United States, 12 CIT 518, 688 F.Supp. 639 (1988), aff'd , 865 F.2d 240 (Fed.Cir.), cert. denied, 492 U.S. 919 (1989); Mitsubishi Electric Corp. v. United States, 898 F.2d 1577 (Fed.Cir. 1990).

The Commission was also left to consider the matter upon a representation in the October 9th transmittal letter that the "only record evidence that exists is petitioners' good faith esti-

---

[14] Public Document ("PubDoc") 50, Attachment.

[15] PubDoc 50, p. 1.  See also id. at 6.

mate, based on their market knowledge and discussion with industry participants". PubDoc 50, p. 5. That is, evidence would have to be collected for the final determination. See id. The commissioners apparently were unwilling to speculate as to where any such evidence might lead. Indeed, as enacted by Congress and interpreted by the courts, the law disfavors speculation and conjecture[16], but it also does favor affirmative preliminary determinations of material injury or the threat thereof.

The record indicates that the ITC gave some consideration as to whether the ITA might grant the petitioners' proposed amendment but found that it was based upon end-use analysis[17] and thus accepted their own admission therein of the ITA's "general reluctance to use end-use to define scope coverage because of inherent enforcement difficulties and prior experiences with end-use certification procedures." PubDoc 50, Attachment, p. 4. See USITC Pub. 3456, p. 9, n. 41.

(1)

Any imports during the above-affirmed period of investigation from Germany (or any other country named in the petition(s)) that were indeed "negligible", as defined in general by 19 U.S.C. §1677(24)(A)(i), supra, engendered Commission consideration of them under the statutory exception to the general rule, to wit:

---

[16] See, e.g., 19 U.S.C. §1677(7)(F)(ii); H.R. Doc. No. 103-316, vol. 1, p. 855; American Lamb Co. v. United States, 785 F.2d 994, 1001 (Fed.Cir. 1986).

[17] See generally PubDoc 50, Attachment.

Imports that would otherwise be negligible under clause (i) shall not be negligible if the aggregate volume of imports of the merchandise from all countries described in clause (i) with respect to which investigations were initiated on the same day exceeds 7 percent of the volume of all such merchandise imported into the United States during the applicable 12-month period.

19 U.S.C. §1677(24)(A)(ii). And those imports facilitated plaintiffs' equation pursuant to this subsection. Furthermore, the statute provides:

**(iii) Determination of aggregate volume**

In determining aggregate volume under clause (ii) or (iv), the Commission shall not consider imports from any country specified in paragraph (7)(G)(ii).[18]

**(iv)  Negligibility in threat analysis**

Notwithstanding clauses (i) and (ii), the Commission shall not treat imports as negligible if it determines that there is potential that imports from a country described in clause (i) will imminently account for more than 3 percent of the volume of all such merchandise imported into the United States, or that the aggregate volumes of imports from all countries described in clause (ii) will imminently exceed 7 percent of the volume of all such merchandise imported into the United States. The Commission shall consider such imports only for purposes of determining threat of material injury.

Obviously, timing is an element of this statute, as it is of this action, the commencement of which, to this court's knowledge, has not impeded the administrative process ordained by Congress and summarized by the court of appeals in American Lamb, 785 F.2d at 998-99. In their reply brief, the plaintiffs predicted

---

[18] This statutory subsection sets forth exceptions to the prescribed Commission cumulation for determining material injury.

that the ITA would modify the scope of this case in response to
their request therefor, and that prediction has proven prescient
sub nom. Dep't of Commerce, Notice of Preliminary Determination of
Sales at Less Than Fair Value:  Carbon and Certain Alloy Steel Wire
Rod from Germany, 67 Fed.Reg. 17,384 (April 10, 2002).  According
to this notice, the petitioners

> requested the scope of the investigation be amended to
> exclude high carbon, high tensile 1080 grade tire cord
> and tire bead quality wire rod actually used in the
> production of tire cord and tire bead, as defined by
> specific dimensional characteristics and specifica-
> tions[19,]

which seemingly has been granted.  See generally 67 Fed.Reg. at
17,385 (Scope of the Investigation).

The ITC record currently before this court reflects that,
based upon official Commerce Department statistics, imports of
subject merchandise from Germany constituted 3.1 percent of the
total of all such imports for the period August 2000 to July 2001.
See USITC Pub. 3456, p. IV-7.  But that percentage was computed
before the ITA decided to modify the scope of the investigation,
and the plaintiffs have taken the position from the beginning that
any such amendment would reduce the German percentage to less than
three and thereby require aggregation of that country's then-
negligible number with those of other lands similarly situated, in
particular, Egypt, South Africa and Venezuela, the percentages for

---

[19] 67 Fed.Reg. at 17,384.  See supra n. 14.

which have been listed as 1.4, 2.6, and 2.1[20], respectively, in a table to the ITC staff report.

The court has no way of finally resolving now this circumstance.  It cannot completely overlook this development in regular course, given the nature of plaintiffs' claims and defendant's stated recognition herein that it "must defer to Commerce's definition of the scope of investigation."[21]  The court also cannot overlook the 1994 Statement of Administrative Action that advised of an intent to preclude termination of a preliminary investigation when, for example,

> imports are extremely close to the relevant quantitative thresholds and there is a reasonable indication that data obtained in a final investigation will establish that imports exceed the quantitative thresholds.

H.R. Doc. No. 103-316, vol. 1, p. 857.  It cannot find that the 3.1 percent attributed to Germany is not now "extremely close" to the

---

[20] See USITC Pub. 3456, p. IV-7.  The court notes in passing that the next-higher percentage to these three and to that listed for Germany is the 3.8 set forth for Indonesia.

[21] While the response brief on behalf of intervenor-defend-ant Siderurgica del Orinoco, C.A. ("Sidor") takes the position (at pages 25-26) that the ITC has authority to determine the "domestic like product" and is not circumscribed by the ITA's scope of investigation, the court does not accept intervenor-defendant's resultant contention that "an amendment to the De-partment's scope has no necessary bearing on the Commission's negligibility analysis".  Sidor Response Brief, p. 23.  Compare Plaintiffs' Reply Brief, p. 15.

Independent of this argument, Sidor does note, as it must, that "[m]any aspects of an investigation . . . can change, and indeed do change".  Sidor Response Brief, p. 17, n. 16.

"less than 3 percent of the volume of all such merchandise imported into the United States" specified in the statute quoted above, 19 U.S.C. §1677(24)(A)(i).[22]  Finally, if, as the court of appeals has affirmed in <u>American Lamb</u>, <u>supra</u>, the

> ITC has consistently viewed the statutory "reasonable indication" standard as one requiring that it issue a negative determination . . . only when (1) the record as a whole contains clear and convincing evidence that there is no material injury or threat of such injury; and (2) no likelihood exists that contrary evidence will arise in a final investigation . . . [and as] involving a process of weighing the evidence but under guidelines requiring clear and convincing evidence of "*no* reasonable indication", and no likelihood of later contrary evidence,[23]

this standard does not now sustain the Commission's termination of its preliminary investigation of imports of carbon and certain alloy steel wire rod from Egypt, South Africa and Venezuela that are alleged to be sold in the United States at less than fair value.

                                    III

        Hence, this action must be, and it hereby is, remanded to the International Trade Commission for reconsideration of the aforesaid termination, given the ITA's above-cited amendment of the scope of investigation.  The defendant may have until August 2, 2002 for such reconsideration and to report the results thereof to

---

        [22] That part of the record emphasized by the plaintiffs (and reproduced as Confidential Appendix 10 to their Rule 56.2 motion) reflects a 2.91 percent ratio for imports from Germany, albeit for the petition period July 2000 to June 2001.

        [23] 785 F.2d at 1001 (emphasis in original).

the other parties and to the court, whereupon any party may serve and file written comments thereon by August 12, 2002.

So ordered.

Decided: New York, New York
         June 20, 2002

_____
Judge