## COSTS

Each party shall bear its own costs.

*AFFIRMED.*

**CO–STEEL RARITAN, INC. (now known as Gerdau Ameristeel Corp.), GS Industries (now known as Georgetown Steel Company, LLC), Keystone Consolidated Industries, Inc., and North Star Steel Texas, Inc., Plaintiffs–Appellees,**

v.

**INTERNATIONAL TRADE COMMISSION, Defendant–Appellee,**

and

**Alexandria National Iron and Steel Company, Defendant–Appellant,**

and

**Siderurgica Del Orinoco, C.A., Defendant–Appellant.**

**Nos. 03–1006, 03–1099.**

United States Court of Appeals, Federal Circuit.

DECIDED: Jan. 26, 2004.

Kathleen W. Cannon, Collier Shannon Scott, PLLC, of Washington, DC, argued for plaintiffs-appellees Co–Steel Raritan, Inc (now known as Gerdau Ameristeel Corp.), et al. With her on the brief were Paul C. Rosenthal and R. Alan Luberda. Of counsel was John M. Herrmann.

Kevin M. O'Brien, Baker & McKenzie, of Washington, DC, argued for defendant-appellant Alexandria National Iron and Steel Company. With him on the brief was Thomas Peele.

David P. Houlihan, White & Case, LLP, of Washington, DC, for defendant-appellant Siderurgica Del Orinoco, C.A. With him on the brief were Richard J. Burke and Frank H. Morgan.

Karen V. Driscoll, Attorney, Office of the General Counsel, United States International Trade Commission, of Washington, DC, argued for defendant-appellee United States International Trade Commission. With her on the brief were Lyn M. Schlitt, General Counsel; and James M. Lyons, Deputy General Counsel.

Before LOURIE, RADER, and SCHALL, Circuit Judges.

Opinion for the court filed by Circuit Judge SCHALL. Concurring in part and dissenting in part opinion filed by Circuit Judge LOURIE.

SCHALL, Circuit Judge.

This is an antidumping case. Alexandria National Iron and Steel Company ("Alexandria") and Siderurgica Del Orinoco, C.A. ("Sidor") appeal the final decision of the United States Court of International Trade in *Co–Steel Raritan, Inc., et al v. United States International Trade Commission,* 24 I.T.R.D 2010, 2002 WL 31052739 (Ct. Int'l Trade 2002) ("*Co–Steel II*"). In that decision, the court affirmed the preliminary determination of the United States International Trade Commission ("Commission") on remand that imports of carbon and alloy steel wire rod ("wire rod") from Egypt, South Africa, and Venezuela during the period of investigation were non-negligible under a revised scope of investigation. *Carbon and Certain Alloy Steel Wire Rod from Egypt, South Africa, and Venezuela,* Inv. Nos. 731–TA–955, –960, –963, USITC Pub. 3543 (Oct. 2002) ("Remand Determination"). Based upon that determination, the Commission concluded that, under 19 U.S.C. § 1673b(a)(1) (2000),[1] there was a reasonable indication that an industry in the United States would suffer material injury from imports of wire rod from those three countries. *Id.*

The Commission originally had issued a preliminary determination in which it found that imports of wire rod from Egypt, South Africa, and Venezuela were negligible. *Carbon and Certain Alloy Steel Wire Rod from Brazil, Canada, Egypt, Germany, Indonesia, Mexico, Moldova, South Africa, Trinidad and Tobago, Turkey, Ukraine, and Venezuela,* Inv. Nos. 701–TA–417–421, 731–TA–953–963, USITC Pub. 3456 (Oct.2001) ("Preliminary Determination"). The antidumping investigation as to imports from those countries therefore had been terminated, in accordance with 19 U.S.C. § 1673b(a)(1). *Carbon and Certain Alloy Steel Wire Rod from Brazil, Canada, Egypt, Germany, Indonesia, Mexico, Moldova, South Africa, Trinidad and Tobago, Turkey, Ukraine, and Venezuela,* 66 Fed.Reg. 54,-539, 2001 WL 1301164 (Oct. 29, 2001) ("Preliminary Determination Order"). On June 20, 2002, however, following an appeal of the Preliminary Determination Order by plaintiffs-appellees, the Court of International Trade ordered a remand and a re-determination of negligibility with respect to imports from Egypt, South Africa, and Venezuela. It did so based upon the fact that six months after the preliminary determination, where the Commission had found such imports to be negligible, the United States Department of Commerce ("Commerce") amended the scope of the anti-dumping investigation. *Co–Steel Rar-*

---

1. Statutory references are to the 2000 version of the United States Code.

*itan, Inc. v. U.S. Int'l Trade Comm'n,* 244 F.Supp.2d 1349 (2002) (*"Co–Steel I"*). The Commission's Remand Determination followed in the wake of *Co–Steel I.* The Commission's finding after remand that imports of wire rod from Egypt, South Africa, and Venezuela were not negligible was based upon additional import data that was gathered in response to Commerce's revised scope of investigation.

On appeal, Alexandria and Sidor, joined by the Commission (collectively "Appellants and the Commission"), argue that the decision of the Court of International Trade in *Co–Steel II* should be reversed because the court erred in *Co–Steel I* when it remanded the Commission's preliminary determination. According to Appellants and the Commission, the remand order was contrary to 19 U.S.C. § 1673b(a)(1), which provides, in relevant part, that the Commission is to make its preliminary determination as to material injury "based upon the information available to it at the time of the determination...." Appellants and the Commission argue that the Court of International Trade abused its discretion in *Co–Steel I* when it directed the Commission on remand to consider circumstances arising after the preliminary determination. Because we agree that the Court of International Trade erred in *Co–Steel I* when it remanded the preliminary determination, we vacate the court's decision in *Co–Steel II* and remand the case to the court for further proceedings consistent with this opinion.

## BACKGROUND

### I.

Generally, "American industries may petition for relief from imports that are sold in the United States at less than fair value ('dumped')...." *Allegheny Ludlum Corp. v. United States,* 287 F.3d 1365, 1368 (Fed. Cir.2002) (citing 19 U.S.C. § 1675b). Commerce determines whether sales have been made at less than fair value, 19 U.S.C. § 1673(1), whereas the Commission determines whether the imported merchandise materially injures or threatens to materially injure the pertinent domestic industry. *Id.* § 1673d(b)(1). If both inquiries are answered in the affirmative, Commerce issues the relevant antidumping duty order. *Id.* § 1673d(c)(2).

An antidumping investigation is typically initiated when a domestic industry files a petition requesting that Commerce conduct an investigation into possible dumping. *Duferco Steel, Inc. v. United States,* 296 F.3d 1087, 1089 (Fed.Cir.2002). The petition initially determines the scope of the investigation. Section 1673a(b)(1) of title 19 provides that the "petition may be amended at such time and upon such terms as [Commerce] and the [Commission] may permit." Commerce makes an initial determination as to whether the petition "contains information ... supporting the allegations." *Id.* § 1673a(c)(1)(A)(i). Commerce then must make a preliminary determination "of whether there is a reasonable basis to believe that or suspect that the merchandise is being sold, or is likely to be sold, at less than fair value." *Id.* § 1673b(b)(1)(A).

At the same time that Commerce is making its preliminary determination as to sales at less than fair value, the Commission must make a preliminary determination as to whether there is a "reasonable indication" that an industry in the United States is "materially injured or is threatened with material injury ... by reason of imports of the subject merchandise and that imports of the subject merchandise are not negligible." *Id.* § 1673b(a)(1). Imports of "subject merchandise" from a country are "negligible" if they "account for less than 3 percent of the volume of all such merchandise imported into the United States" during the relevant period. *Id.*

§ 1677(24)(A)(i). Section 1677(24)(A) of title 19, however, contains an exception with respect to negligibility. Imports of "subject merchandise" from a country that would otherwise be negligible because they account for less than three percent of all such imports are not negligible if the total volume of imports of subject merchandise from all countries under investigation having imports not exceeding three percent exceeds seven percent of the volume of all such merchandise imported into the United States. *Id.* § 1677(24)(A)(ii). If the Commission determines that "imports of the subject merchandise are negligible," the antidumping investigation is terminated. *Id.* § 1673b(a)(1). The term " "subject merchandise" is defined as the class or kind of merchandise that is within the scope of an investigation...." *Id.* § 1677(25).

Following preliminary determinations by Commerce and the Commission that do not result in termination of the investigation, Commerce makes a final determination "of whether the subject merchandise is being, or is likely to be, sold in the United States at less than its fair value." *Id.* § 1673d(a)(1). For its part, the Commission makes a final determination as to material injury or threat of material injury. *Id.* § 1673d(b)(1). If the Commission determines that such injury exists, Commerce issues the appropriate antidumping order. *Id.* § 1673d(c)(2).

## II.

Alexandria and Sidor are Egyptian and Venezuelan producers, respectively, of wire rod. Wire rod is a hot-rolled, intermediate steel product of circular (or approximately circular) cross-section. It is used to make a wide variety of products, ranging from clothes hangers and chain link fencing to highly specialized products, such as tire cord. Co–Steel Raritan, Inc. (now known as Gerdau Ameristeel Corp), GS Industries (now known as Georgetown Steel Company, LLC), Keystone Consolidated Industries, Inc., and North Star Steel Texas, Inc. (collectively "Co–Steel") are domestic producers of wire rod.

On August 31, 2001, Co–Steel filed petitions alleging that an industry in the United States was materially injured (i) by reason of subsidized imports of wire rod from Brazil, Canada, Germany, Trinidad and Tobago, and Turkey and (ii) by reason of imports of wire rod from Brazil, Canada, Egypt, Germany, Indonesia, Mexico, Moldova, South Africa, Trinidad and Tobago, Ukraine, and Venezuela that allegedly were being sold at less than fair value.

On September 10, 2001, the Commission instituted antidumping and countervailing duty investigations. *See Carbon and Certain Alloy Steel Wire Rod from Brazil, Canada, Egypt, Germany, Indonesia, Mexico, Moldova, South Africa, Trinidad and Tobago, Turkey, Ukraine, and Venezuela,* 66 Fed.Reg. 47,036, 2001 WL 1023179 (Sept. 10, 2001). Thereafter, on October 2, 2001, Commerce initiated its wire rod antidumping investigation, proceeding under the scope of investigation proposed by Co–Steel in its petitions. *See Notice of Initiation of Antidumping Duty Investigations: Carbon and Certain Alloy Steel Wire Rod from Brazil, Canada, Egypt, Germany, Indonesia, Mexico, Moldova, South Africa, Trinidad and Tobago, Turkey, Ukraine, and Venezuela,* 66 Fed. Reg. 50,164, 2001 WL 1152668 (Oct. 2, 2001).

Negligibility was the critical issue before the Commission in its preliminary investigation in the wire rod case. In order to make a determination with respect to negligibility in a given case, the Commission examines official import statistics for the subject merchandise for the most recent twelve-month period for which data is available. 19 U.S.C. § 1677(24)(A)(i).

The confidential staff report in connection with the Commission's preliminary in-

vestigation (the "Staff Report") was released to the parties on October 9, 2001, three days prior to the vote of the Commission on the preliminary injury determination. *See* 19 C.F.R. § 207.17 (2000). The Staff Report contained import data from August 2000 through July 2001. The report stated that imports from three of the twelve countries under investigation were negligible. Those countries and their share of total imports of wire rod were as follows: Egypt, 1.4%; South Africa, 2.6%; and Venezuela, 2.1%. *Id.* The total share of wire rod imports from those three countries was thus 6.1%. *Co–Steel I*, 244 F.Supp.2d at 1353–54. The Staff Report also stated that imports of wire rod from Germany were 3.1% of total imports, making its share 0.1% above the negligibility threshold. *Id.* According to the Staff Report, Egypt, South Africa, and Venezuela were the only three countries from which imports of wire rod were less than three percent. Because the aggregate of imports of wire rod from Egypt, South Africa, and Venezuela was less than seven percent, the Staff Report stated that imports of wire rod from those countries were negligible under 19 U.S.C. § 1673b(a)(1).

On October 9, 2001, the same day that the Staff Report was released, Co–Steel sent the Commission a letter advising that Co–Steel had that day asked Commerce to modify the scope of the wire rod investigation. In its October 9 letter to Commerce, Co–Steel identified the products that it was requesting be excluded from the scope of the investigation. Co–Steel requested that

> the scope of the investigation hereby be amended to exclude certain 1080 grade tire cord and tire bead quality wire rod actually used in the production of tire cord and bead. The products intended to be excluded are high carbon, high tensile 1080 grade wire rod that is used

to produce tire cord and tire bead. No other tire cord or bead grade wire rod is excluded from the scope, and any product, regardless of grade, that is used for an application other than tire cord or bead is specifically included in scope unless otherwise specifically excluded. . . .

In its October 9 letter to the Commission, Co–Steel stated that the requested scope modification "could have significant impact on the Commission's consideration of the preliminary determination." Co–Steel maintained that its proposed scope modification, which would exclude certain 1080 grade tire cord wire rod and 1080 tire bead wire rod from the investigation, would result in subject wire rod imports from Germany falling below the three percent threshold for negligibility. Co–Steel argued that because such imports from Germany would fall below three percent, they would be found to be negligible. Consequently, they would be combined with imports of wire rod from Egypt, South Africa, and Venezuela, the result being that imports from all four countries combined would exceed the seven percent aggregate test and thus be found to be non-negligible. "Under these circumstances," Co–Steel wrote, "the Commission should not terminate the investigation as to any of the countries for reasons of negligibility because there is a substantial likelihood that no country will be negligible under 19 U.S.C. § 1677(24)(A)(ii)." Co–Steel stated that the Commission had not collected information on imports of the products that would likely be excluded should Commerce make the requested scope modification and that the "only record evidence that exists is petitioners' good faith estimates, based on their market knowledge and discussion with industry participants, that the total imports of such excluded products is about 224,000 net tons per year, approximately 15,000 net tons of which are supplied by Germany."

On October 12, 2001, the Commission concluded, in a(5–1) preliminary determination, that subject wire rod imports from Egypt, South Africa, and Venezuela were negligible for purposes of its material injury analysis. The Commission noted that, although Co–Steel had requested that Commerce exclude from the scope of investigation certain grade 1080 wire rod, Commerce had not acted on the request. *Preliminary Determination*, USITC Pub. 3456 at 6 n.12. The Commission determined that Co–Steel's request to Commerce and its related assertions were not sufficient to cause the Commission to conclude that evidence contrary to that already gathered would arise in any final phase of the investigation. In response to Co–Steel's October 9 letter, the Commission stated:

> Petitioners acknowledge that "the only record evidence" regarding the effect of this proposed exclusion is "Petitioners' good faith estimate based on their market knowledge and discussion with industry participants." Petitioners' October 9, 2001 Letter at 5. Further, Petitioners state in the request to Commerce, attached to their October 9, 2001 letter, that they are "aware of the Department's (Commerce) general reluctance to use end-use to define scope of coverage...." Petitioners' October 9, 2001 Letter, Attachment at 4.

*Id.* at 13 n. 41. The Commission further stated:

> [I]t is speculative that Commerce will amend the scope as Petitioners wish. Moreover, it is speculative that amending the scope will likely result in finding that no country's subject imports are negligible. We make our negligibility determinations based on the scope and

factual record before us, not speculation. We conclude that Petitioners' request to Commerce and their related assertions are not sufficient to conclude that contrary evidence to that already gathered on these issues, which soundly supports our negligibility determinations, would arise in any final phase of these investigations.

*Id.*

Thus, the Commission based its negligibility determination on the factual record before it, refusing to "speculate" as to whether Commerce would amend the scope of the investigation. *Id.* The Commission also concluded that imports of subject wire rod from Egypt, South Africa, and Venezuela would not imminently exceed the negligibility threshold of three percent individually or seven percent in the aggregate. *Id.* at 13–14. In addition to its negligibility determinations with respect to Egypt, South Africa, and Venezuela, the Commission made affirmative material injury determinations with respect to the other subject countries, including Germany.[2] Based upon the preliminary determination, Commerce terminated the investigation of imports of wire rod from Egypt, South Africa, and Venezuela. *Preliminary Determination Order*, 66 Fed.Reg. at 54,539.

### III.

On October 30, 2001, Co–Steel filed suit in the Court of International Trade challenging the findings of the preliminary determination insofar as they related to Egypt, South Africa, and Venezuela. Before the Court of International Trade, Co–Steel argued that Commerce's termination of the wire rod investigation as to Egypt, South Africa, and Venezuela was arbitrary, capricious, an abuse of discre-

---

**2.** The countries for which the Commission made affirmative material injury determinations were Brazil, Canada, Germany, Indonesia, Mexico, Moldova, Trinidad and Tobago, and Ukraine.

tion or otherwise not in accordance with law. In making that argument, Co–Steel advanced three contentions. First, it pointed out that, pursuant to 19 U.S.C. § 1677(24)(A)(i), the Commission was required to base its negligibility determination on the most recent twelve-month period for which data was available that preceded the filing of the petitions. Co–Steel argued that the Commission violated the statute by basing its negligibility determination on the period August 2000 through July 2001, rather than the period July 2000 through June 2001. Second, Co–Steel urged that the Commission's determination that imports from Egypt, South Africa, and Venezuela would not imminently exceed the statutory negligibility threshold was erroneous. Co–Steel argued that if subject imports of wire rod from Germany were to fall below three percent, they would be found negligible. Being found negligible, such imports would be aggregated with those of the other three countries found to be negligible, Egypt (1.4%), South Africa (2.6%), and Venezuela (2.1%). Under these circumstances, Co–Steel stated, imports of wire rod from Egypt, South Africa, Venezuela, and Germany would exceed the limit for negligibility in 19 U.S.C. § 1677(24)(A)(ii) because the total of all such imports from those four countries would be greater than seven percent. Finally, Co–Steel argued that the Commission had erred in concluding that there was no reasonable indication that imports from Egypt, South Africa, and Venezuela would imminently exceed statutory negligibility levels, whether considered individually or collectively.

While Co–Steel's suit was pending, Commerce continued its antidumping and countervailing duty investigations as to imports of wire rod from countries with respect to which the Commission had made preliminary determinations of material injury. Those countries were Brazil, Canada, Germany, Indonesia, Mexico, Moldova, Trinidad and Tobago, and Ukraine. During this period, several scope modification requests were sent to Commerce, including an additional scope modification request from Co–Steel in November of 2001. Commerce ultimately modified the scope of the antidumping investigation in April of 2002 in a manner similar, but not identical, to the scope modification requested in Co–Steel's October 9, 2001 letter.

On June 20, 2002, the Court of International Trade issued its opinion in *Co–Steel I.* Ruling on Co–Steel's motion for judgment on the administrative record, the court first rejected Co–Steel's contention that, in making its preliminary determination of negligibility, the Commission had improperly relied on data from the period August 2000 through July 2001. The court then turned to Co–Steel's argument based upon imports of wire rod from Egypt, South Africa, and Venezuela being aggregated with those from Germany if wire rod imports from that country were found to be less than three percent. The court noted that, prior to the scope revision, Germany's share of imports of wire rod, at 3.1%, was extremely close to the negligibility threshold of § 1677(24)(A)(i). The court further noted that while the Commission was aware of Co–Steel's scope modification request submitted to Commerce, the request was not resolved until after the Preliminary Determination Order. The court observed that the Commission was left to consider the matter upon Co–Steel's representation that the only record evidence regarding the impact of the requested exclusion of products from the scope of investigation was Co–Steel's good faith estimate. Under these circumstances, the court granted Co–Steel's motion to remand the case back to the Commission for it to consider the change in scope. Referring to the modification of the scope of the investigation in 2002, the court stated:

The court has no way of finally resolving now this circumstance.... It cannot completely overlook this development in regular course, given the nature of the plaintiffs' claims and defendant's stated recognition herein that it "must defer to Commerce's definition of the scope of the investigation." The court also cannot overlook the 1994 Statement of Administrative Action that advised of an intent to preclude termination of a preliminary investigation when, for example, "[i]mports are extremely close to the relevant quantitative thresholds and there is a reasonable indication that data obtained in a final investigation will establish that imports exceed the quantitative thresholds."

*Co–Steel I,* 244 F.Supp.2d at 1358 (citations omitted). In its decision in *Co–Steel I,* the Court of International Trade did not address Co–Steel's contention that the Commission had erred in concluding that there was no reasonable indication that wire rod imports from Egypt, South Africa, and Venezuela would imminently exceed statutory negligibility levels, whether considered individually or collectively.

In due course, the Commission moved for reconsideration. In its motion, the Commission argued that requiring it to consider post-determination developments jeopardized the finality of preliminary determinations and required it to consider extra-record evidence in making its preliminary determination. The Court of International Trade denied the motion on August 7, 2002, noting that Commerce had modified the scope, "as to apparently undermine, on the [Commission] record developed," the terminations of the investigations, and that the Commission had "conceded" that it had to defer to Commerce's modified scope. *Co–Steel Rari-*

*tan, Inc. et al. v. U.S. Int'l Trade Comm'n,* No. 01–00955, at 2 (Ct. Int'l Trade Aug. 7, 2002).

On remand, the Commission interpreted *Co–Steel I* as "directing the Commission to conduct further investigations to answer the Court's question—namely, does Commerce's modified scope of investigation issued in April 2002 alter Germany's share of total imports...." Remand Determination, USITC Pub. 3543, at 6. As a result, the Commission reopened the record and gathered additional import data consistent with the modified scope of investigation. This changed the negligibility determination. Under the scope of the investigation as modified, subject wire rod imports from Germany were found to be less than three percent of total wire rod imports. At the same time, subject wire rod imports from Egypt, South Africa, and Venezuela all remained below three percent of the total amount of such imports. Aggregated, subject wire rod imports from all four countries were found to exceed seven percent of total imports of wire rod. Accordingly, the Commission found subject wire rod imports from Egypt, South Africa, and Venezuela to be non-negligible under 19 U.S.C. § 1677(24)(A)(ii) for purposes of its material injury analysis. *Id.* at 11. After analyzing imports of wire rod from Egypt, South Africa, and Venezuela, the Commission made an affirmative determination as to material injury: "[W]e determine pursuant to the Court's Order, that there is a reasonable indication that the domestic industry producing wire rod is materially injured by reason of imports of wire rod from Egypt, South Africa and Venezuela that are allegedly sold in the United States at less than fair value." *Id.* at 24. The Court of International Trade affirmed the Remand Determination on September 13, 2002, in *Co–Steel II.*[3] This appeal followed.

3. The Commission issued its final determina-

tions in the wire rod investigations on Octo-

## ANALYSIS

### I.

By order dated October 27, 2003, we requested briefing from the parties on (i) our jurisdiction in this matter and (ii) the jurisdiction of the Court of International Trade to review the Commission's affirmative preliminary determination that followed the court's remand order in *Co–Steel I. See Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986) ("Every federal appellate court has a special obligation to satisfy itself ... of its own jurisdiction ... even though the parties are prepared to concede it." (citations omitted)); *Nystrom v. TREX Co.*, 339 F.3d 1347, 1349 (Fed.Cir.2003). Before turning to the merits, we address these two jurisdictional questions. We consider first the question of our jurisdiction.

### A.

■ Our authority to review decisions of the Court of International Trade is set forth at 28 U.S.C. § 1295(a)(5). That statute provides that the Federal Circuit has exclusive jurisdiction "of an appeal of a

final decision of the Court of International Trade." A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute judgment." *Cunningham v. Hamilton County, Ohio,* 527 U.S. 198, 204, 119 S.Ct. 1915, 144 L.Ed.2d 184 (1999) (quoting *Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 89 L.Ed. 911 (1945)). The decision of the Court of International Trade in *Co–Steel II* was a final decision because it ended the litigation that began with the filing of Co–Steel's complaint challenging the Commission's negative preliminary determination. We therefore have jurisdiction over Alexandria's and Sidor's appeals.

Co–Steel contends, however, that *Co–Steel II* was not a "final decision" because it did not terminate all agency proceedings. Co–Steel points out that the Commission's affirmative preliminary determination on remand did not end the antidumping investigation. Instead, it brought back to life the parallel investigations by Commerce and the Commission that had been terminated following the preliminary determination:

ber 16, 2002. *Carbon and Certain Alloy Steel Wire Rod from Brazil, Canada, Germany, Indonesia, Mexico, Moldova, Trinidad and Tobago, and Ukraine,* 67 Fed.Reg. 66662–63, Inv. Nos. 701–TA–417–419, 731–TA–953, –954, –956–959, –961, –962 (Final), USITC Pub. 3546, 2002 WL 31433220 (Nov.2002) ("Final Determination"). In the Final Determination, the Commission found imports of wire rod from Germany to be negligible, but the pendency of this appeal prevented the Court of International Trade's *Co–Steel II* decision, and therefore the Commission's Remand Determination, from becoming final. *See* 28 U.S.C. § 2645(c) ("A decision of the Court of International Trade is final and conclusive unless an appeal is taken to the Court of Appeals for the Federal Circuit...."); *Hosiden Corp. v. Advanced Display Mfrs. of Am.,* 85 F.3d 589, 590 (Fed.Cir.1996) ("[T]he decision of the Court of International Trade is not a 'final court decision' when appeal has been

taken to the Federal Circuit."). Accordingly, for purposes of the final determination in the wire rod investigations, the Commission considered it inappropriate to aggregate subject imports of wire rod from Germany with such imports from Egypt, South Africa, and Venezuela for purposes of its negligibility analysis, as it had done in the Remand Determination. Co–Steel has appealed the Commission's final wire rod determinations as to Germany to the Court of International Trade in *Georgetown Steel Co., LLC v. United States,* CIT Court Case 02–00739. The Commission filed a motion to stay the Georgetown Steel litigation pending our decision in this case, but the Court of International Trade denied the motion. *Georgetown Steel Co. v. United States,* 259 F.Supp.2d 1344, 1349 (Ct. Int'l Trade 2003). Alexandria appealed to this court from the Court of International Trade's decision in *Co–Steel II* on September 23, 2002, prior to the Final Determination.

Once the [Commission] changed its position on remand and issued an affirmative preliminary determination, however, there was no longer a 'final decision' by the Commission because the case was no longer terminated. Rather, further action by the [Commission] and Commerce [was] required under the statutory scheme. *See* 19 U.S.C. §§ 1673b, 1673d.

Under these circumstances, Co–Steel asserts, the decision of the Court of International Trade in *Co–Steel II* was not a "final decision" within the meaning of § 1295(a)(5). Accordingly, we are without jurisdiction in the case. In making that argument, Co–Steel relies upon *Jeannette Sheet Glass Corp. v. United States*, 803 F.2d 1576 (Fed.Cir.1986). We are not persuaded by Co–Steel's arguments.

The Court of International Trade exercised jurisdiction in *Co–Steel I* pursuant to 19 U.S.C. § 1516a(a)(1)(C), which is section 516A of the Tariff Act of 1930. Pursuant to 28 U.S.C. § 1581(c), the Court of International Trade has "exclusive jurisdiction of any civil action commenced under section 516A of the Tariff Act of 1930." Section 1516a(a)(1)(C) provides that, within thirty days of the publication in the Federal Register of a negative preliminary determination by the Commission,

> an interested party who is a party to the proceeding in connection with which the matter arises may commence an action in the United States Court of International Trade by filing concurrently a summons and a complaint, each with the content and in the form, manner, and style prescribed by the rules of that court, contesting any factual findings or

legal conclusions upon which the determination is based.

The statute further provides that, in any action brought under § 1516a(a)(1)(C), the Court of International Trade "shall hold unlawful any determination found ... to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(A). Thus, Congress created a cause of action pursuant to which an interested party may challenge, in the Court of International Trade, a negative preliminary determination by the Commission.[4] In this case, Co–Steel took advantage of § 1516a(a)(1)(C) to bring a suit to challenge the Commission's finding that imports of wire rod from Egypt, South Africa, and Venezuela were negligible, the finding that led to the Commission's negative preliminary determination as to material injury. That suit proceeded through the remand order in *Co–Steel I* and ended with the decision in *Co–Steel II* that affirmed the Commission's affirmative preliminary determination on remand as to material injury. The case concluded in the Court of International Trade when the court entered judgment pursuant to its Rule 58. *See* U.S.Ct. of Int'l Trade Rule 58 ("[A] judgment, decree or final order shall be entered upon every final decision from which an appeal lies. ..."). The decision of the Court of International Trade was, in all respects, a "final decision" within the meaning of 28 U.S.C. § 1295(a)(5).

Co–Steel is correct that the effect of the Commission's affirmative preliminary determination would be to reinstate the antidumping investigation that had been

---

4. The statutory cause of action allowing an appeal from a negative preliminary determination is entirely separate and distinct from the cause of action created for an appeal from a negative or an affirmative *final* determination. *See* 19 U.S.C. § 1516a(a)(2)(B)(i) & (ii). That these causes of action are separate is illustrated by the requirement that, irrespective of any prior challenge to a preliminary determination, the party appealing from a final determination must file a new summons and complaint to commence any action under § 1516a(a)(2)(B). *See id.* at § 1516a(a)(2)(A).

terminated by the Commission's original negative preliminary determination, subject to the resolution of any appeal taken to this court. *See* 28 U.S.C. § 2645(c); *Hosiden*, 85 F.3d at 591. However, Co–Steel is not correct in arguing that the affirmative preliminary determination cut off the right of Alexandria and Sidor to appeal the final decision of the Court of International Trade in *Co–Steel II*. Had the Court of International Trade affirmed the Commission's original negative preliminary determination, Co–Steel would have had the right to appeal to this court from the adverse ruling in the litigation it had initiated. *See Tex. Crushed Stone Co. v. United States*, 35 F.3d 1535 (Fed. Cir.1994). In the absence of clear and express statutory language, we are not prepared to hold that Congress gave antidumping petitioners the right to bring actions challenging negative preliminary determinations, but at the same time intended that only such petitioners—and not intervenors or the Commission—would have the right to appeal adverse decisions in such actions. The Supreme Court has stated that "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Lindahl v. OPM*, 470 U.S. 768, 778, 105 S.Ct. 1620, 84 L.Ed.2d 674 (1985) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). The fact that an original affirmative preliminary ·determination is not independently appealable to the Court of International Trade does not satisfy this requirement. In short, clear and convincing evidence of legislative intent to allow only antidumping petitioners to appeal adverse decisions of the Court of International Trade in actions brought under § 1516a(a)(1)(C) is not present.[5]

Finally, *Jeannette* does not help Co–Steel. In that case, Jeannette Sheet Glass Corp. ("Jeannette") filed a petition with the Commission and Commerce alleging that imports of thin sheet glass ("TSG") at less than fair value from Switzerland, Belgium, and the Federal Republic of Germany were materially injuring or threatening to injure materially the domestic industry. After conducting a preliminary investigation, the Commission made two negative preliminary determinations. First, it concluded that there was no reasonable indication that the domestic regular quality TSG industry was materially injured or threatened with material injury by reason of imports of regular quality TSG from the three named countries allegedly sold at less than fair value. Second, the Commission concluded that there was no reasonable indication that the establishment of a high quality TSG industry in the United States was being materially retarded by reason of high quality TSG from Belgium or the Federal Republic of Germany allegedly being sold at less than fair value. *Jeannette*, 803 F.2d at 1577–78.

Jeannette challenged both negative preliminary determinations in the Court of International Trade. By order dated March 22, 1985, the court affirmed the Commission's determination of no materi-

---

**5.** It is not surprising that this is so. If the approach urged by Co–Steel were adopted, the Commission would not be able to appeal a decision of the Court of International Trade rejecting a negative preliminary determination. Conceivably, such a decision by the Court of International Trade could have important consequences for the Commission's administration of that part of the preliminary phase of antidumping investigations for which it is responsible. Barring Commission appeals of such decisions would prevent the Commission from challenging adverse Court of International Trade decisions relating to preliminary investigations that the Commission felt were injurious to the administration of the antidumping scheme. We see no evidence that Congress intended such a result.

al retardation in the establishment of a high quality TSG industry in the United States. *Id.* at 1578. In the same order, however, the court held that the reasonable indication standard used by the Commission in determining that there was no material injury in the regular quality TSG industry was inconsistent with the standard mandated by the court in *Republic Steel Corp. v. United States,* 591 F.Supp. 640 (Ct. Int'l Trade 1984). As a result, the court remanded the case to the Commission to reconsider its preliminary "no injury" determination in light of *Republic Steel. Jeannette,* 803 F.2d. at 1577–78. Thereafter, on July 12, 1985, the Commission on remand applied the *Republic Steel* standard and arrived at an affirmative preliminary injury determination. That determination was affirmed by the Court of International Trade in an order issued on September 10, 1985. However, the Court of International Trade did not issue a final judgment in the case pursuant to Rule 58. *Id.* at 1579. Neither did the court issue a judgment pursuant to its Rule 54(b).[6]

Jeannette filed an initial appeal of the Court of International Trade's March 22, 1985 order insofar as it affirmed the preliminary determination of no material retardation in the high quality TSG industry. The appeal was docketed as No. 85–2455. Subsequently, on Jeannette's motion, the appeal was stayed pending resolution in the Court of International Trade of the remainder of the case pertaining to material injury in the regular quality TSG industry. *Id.* After the Court of International Trade issued its order of September 10, 1985, Jeannette appealed from that part of the order that related to material retardation. The appeal was docketed in this court as No. 86–609 and was consolidated with No. 85–2455. In due course, Glaver-

bel, S.A. ("Glaverbel"), an intervenor-appellee in the case, moved to dismiss Jeannette's appeal for lack of jurisdiction on the ground that the September 10, 1985 order of the Court of International Trade was interlocutory. *Id.*

Meanwhile, on August 19, 1986, while Glaverbel's motion to dismiss was pending, the Commission filed a motion for reconsideration in the Court of International Trade. In asking the court to reconsider its September 10 order, the Commission pointed out that on February 28, 1986, the Federal Circuit, in *American Lamb Co. v. United States,* 785 F.2d 994 (Fed.Cir. 1986), had rejected the "reasonable indication" standard adopted by the Court of International Trade in *Republic Steel.* As noted above, the basis for the Court of International Trade's March 22, 1985 remand of the material injury issue to the Commission was its determination that the Commission had misapplied the *Republic Steel* standard. *Jeannette,* 803 F.2d at 1579.

On October 28, 1986, while the Commission's motion for reconsideration still was pending before the Court of International Trade, and while a final judgment still had not been entered in the Court of International Trade pursuant to the court's Rule 58, the Federal Circuit ruled on Glaverbel's motion to dismiss. *Id.* at 1583. The court first stated that the Court of International Trade's September 10, 1985 order was not a final decision of the court for purposes of appellate review:

> Though the September 10 order affirmed the [Commission's] preliminary "injury" determination, it was not final ... because further proceedings at the agency level were necessary before the case became final. Thus, a final determination of no injury had to be made at

6. In 1985, Rule 54(b) of the United States Court of International Trade Rules was identical to Federal Rule of Civil Procedure 54(b). *See id.* at 1580. This remains the case today.

the Commission and a preliminary and final determination of [less than fair value] had to be made at the International Trade Administration ... of the Department of Commerce.

*Id.* at 1580.

From that the court posited that the issue before it was the same with respect to both the March 22, 1985 and September 10, 1985 orders: "whether Jeannette can seek to appeal the final part of an order comprising a final and a non-final part." *Id.* The court continued that these two parts were essentially dispositions of two "claims" within the scope of Rule 54(b) of the Court of International Trade. According to the court, the non-final claim related to dumping regular quality TSG at less than fair value (material injury claim), while the final claim concerned dumping high quality TSG at less than fair value (material retardation claim). Stated the court: "That is the classic situation for Rule 54(b) certification, yet there was none here. Without it, the appeal must be dismissed." *Id.* The court further stated:

> Also relevant to our decision is that the trial judge has before him the Commission's motion to reconsider, in light of this Court's decision in *American Lamb,* the "injury" aspect of the case and to affirm the [Commission's] earlier holding of no preliminary injury. Resolution of that motion in the Commission's favor could speed up greatly the material injury aspect of this case, leading to that aspect and "material injury" being before us in the near future.

*Id.* at 1582. The court granted Glaverbel's motion to dismiss and dismissed the appeal without prejudice to the Court of International Trade certifying the case pursuant to its Rule 54(b).

In relying on *Jeannette,* Co–Steel points to the court's statement quoted above that the Court of International Trade's September 10, 1985 order was not a final order. It contends that the statement compels dismissal of Alexandria's and Sidor's appeals. It asserts that, in view of the Commission's affirmative preliminary determination on remand, the antidumping investigation process must now proceed to a final determination before there can be any further judicial proceedings. *See* 19 U.S.C. § 1516a(a)(2)(B)(i), (ii) (providing for review in the Court of International Trade of final affirmative and negative determinations by Commerce and the Commission under 19 U.S.C. § 1673d, respectively).

The problem with Co–Steel's argument is that the statement from *Jeannette* upon which it relies is dictum. The word "dicta" is an abbreviation for *obiter dicta,* which describes statements made by a court that are "unnecessary to the decision in the case, and therefore not precedential (though [they] may be considered persuasive)." *Black's Law Dictionary* 1100 (7th ed.1999). Dictum includes "a remark made or opinion expressed by a judge, in his decision upon a cause, 'by the way'— that is, incidentally or collaterally, and not directly upon the question before the court; or it is any statement of law enunciated by the judge or court merely by way of illustration, argument, analogy, or suggestion. . . ." *Id.* (quoting William M. Lile et al., *Brief Making and the Use of Law Books* 304 (3d ed.1914)). Because statements made in dicta do not implicate the substantive holding of the case, they "cannot be considered binding authority." *Kastigar v. United States,* 406 U.S. 441, 454–55, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972); *see also Smith v. Orr,* 855 F.2d 1544, 1550 (Fed.Cir.1988) ("It is well established that a general expression in an opinion, which expression is not essential to the disposition of the case, does not control a judgment in a subsequent proceeding.").

The *Jeannette* court's statement with respect to the absence of final determinations by Commerce and the Commission was dictum. It was dictum because it was unnecessary for the court's correct holding that the September 10, 1985 decision of the Court of International Trade was not a final decision of the court so as to confer jurisdiction upon the Federal Circuit under 28 U.S.C. § 1295(a)(5). At the time *Jeannette* was decided, there was no final decision of the Court of International Trade. As the Federal Circuit's decision recognizes, not only had a final judgment not been entered in the Court of International Trade with respect to the material retardation issue (the March 22, 1985 order), but there was pending before the Court of International Trade the Commission's motion for reconsideration relating to the material injury issue based upon *American Lamb*. In short, it could not be said that the September 10 order "end[ed] the litigation on the merits and le[ft] nothing for the court to do but execute judgment." *Cunningham*, 527 U.S. at 204, 119 S.Ct. 1915 (quoting *Catlin*, 324 U.S. at 233, 65 S.Ct. 631). Indeed, in its final decision in *Jeannette*, the Court of International Trade affirmed the Commission's original negative preliminary determination and vacated its affirmance of the remand determination. *See Jeannette Sheet Glass Corp. v. United States*, 654 F.Supp. 179 (Ct. Int'l Trade 1987). Under these circumstances, it was not necessary for the *Jeannette* court to speak to whether it would have jurisdiction only following a decision by the Court of International Trade following a final determination by the Commission, because there was not yet a final decision by the Court of International Trade compelling a final determination process before the Commission. In short, *Jeannette* does not support Co–Steel's argument that we lack jurisdiction because there has not been a final decision of the Court of International Trade within

the meaning of 28 U.S.C. § 1295(a)(5). We turn now to the second jurisdictional question that is before us: whether the Court of International Trade had authority in *Co–Steel II* to review the Commission's affirmative preliminary determination that followed the court's remand order in *Co–Steel I*.

## B.

■ Co–Steel argues that the Court of International Trade did not have authority to review the Commission's affirmative preliminary determination on remand because under 19 U.S.C. § 1516a(a)(1)(C), judicial review is permitted only of negative preliminary determinations by the Commission. For the reasons that follow, we do not agree.

It is true that § 1516a does not authorize the review of an affirmative preliminary determination. However, as discussed above, the statute does grant the Court of International Trade jurisdiction to review a negative preliminary determination. *See* 19 U.S.C. § 1516a(a)(1)(C); *Tex. Crushed Stone*, 35 F.3d at 1539 n. 5. Thus, the Court of International Trade properly exercised jurisdiction in *Co–Steel I*. It is for this reason that the court had jurisdiction to review the Remand Determination. The decision of the court in *Co–Steel I* was not a final decision because, rather than ending the litigation, it remanded the matter to the Commission for further proceedings. *See Viraj Group, Ltd. v. United States*, 343 F.3d 1371, 1375 (Fed.Cir.2003) (stating that "the general rule is that decisions by a court remanding a matter to an agency are non-final and not appealable to a reviewing court"); *Jeannette*, 803 F.2d at 1579 (order of the Court of International Trade remanding matter to the Commission for reconsideration of preliminary "no injury" determination not final). Thus, in considering the

Remand Determination, the Court of International Trade merely *continued to adjudicate* the same case that had been properly presented to it as an appeal from a negative preliminary determination and that was not yet final. In other words, the court's authority to review the Remand Determination in *Co–Steel II* derived from the proper exercise of its jurisdiction in *Co–Steel I. See Roquette Freres v. United States,* 7 CIT 45, 46, 1984 WL 3694 (Ct. Int'l Trade 1984) (explaining that once an action has commenced, the Court of International Trade's jurisdiction "is continuing, notwithstanding the fact that the court remanded the action to the ITC for further determination"). The determinations in *Co–Steel I* and *II* are thus properly thought of as decisions stemming from the same jurisdictional root, rather than as separate proceedings, each requiring an independent jurisdictional basis. *See* 28 U.S.C. § 1581(c) (granting the Court of International Trade "exclusive jurisdiction of any civil action *commenced* under [19 U.S.C. § 1516a]" (emphasis added)). We note that we implied as much in *Bingham & Taylor Division v. United States,* 815 F.2d 1482, 1484 (Fed.Cir.1987). Thus, the Court of International Trade properly exercised jurisdiction in *Co–Steel II.*

### II.

The Court of International Trade reviews a *Commission determination* under the standard of review set forth in 19 U.S.C. § 1516a(b)(1). *Tex. Crushed Stone,* 35 F.3d at 1539. Under that standard, a preliminary determination by the Commission must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(A). We "review a decision of the [Court of International Trade] by applying for ourselves the statute's standard of review to the [Commission's] determination." *Tex. Crushed Stone,* 35 F.3d at 1539. In applying that standard,

we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although [the] inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency. *Id.* at 1540 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)).

### III.

The requirement that the Commission make a preliminary determination with respect to material injury and non-negligibility is set forth at 19 U.S.C. § 1673b(a), which is titled "Preliminary Determinations." The statute provides, in pertinent part, as follows:

[T]he Commission ... shall determine, based on the information available to it at the time of the determination, whether there is a reasonable indication that—

(A) an industry in the United States—

(i) is materially injured, or

(ii) is threatened with material injury,

by reason of imports of the subject merchandise that are not negligible. If the Commission finds that imports of the subject merchandise are negligible ... the investigation shall be terminated.

19 U.S.C. § 1673b(a)(1). The Commission has forty-five days from the date a petition is filed to make its preliminary determination. *Id.* § 1673b(a)(2)(A)(i). Negligible imports are defined in 19 U.S.C. § 1677(24)(A) in pertinent part as follows:

(i) Except as provided in clause[ ] (ii) ... imports from a country of merchandise corresponding to a domestic like product identified by the Commission are "negligible" if such imports account for less than 3 percent of the volume of

all such merchandise imported into the United States in the most recent 12–month period for which data are available . . . .

(ii) Exception. Imports that would otherwise be negligible under clause (i) shall not be negligible if the aggregate volume of imports of the merchandise from all countries described in clause (i) with respect to which investigations were initiated on the same day exceeds 7 percent of the volume of all such merchandise imported into the United States during the applicable 12–month period.

*Id.* Thus, the Commission is to make a preliminary determination as to whether there is a "reasonable indication" that an industry in the United States "is materially injured, or is threatened with material injury . . . by reason of imports of the subject merchandise and that imports of the subject merchandise are not negligible." *Id.* § 1673b(a)(1).

The statutory provisions at issue in this case, 19 U.S.C. §§ 1673b(a) and 1677(24), are part of the Tariff Act of 1930. In 1994, the Tariff Act was amended through the Uruguay Round Agreements Act, Pub.L. No. 103–465, 108 Stat. 4809 (1994) ("URAA"). *See Micron Tech., Inc. v. United States,* 243 F.3d 1301, 1309 (Fed. Cir.2001); *British Steel PLC v. United States,* 127 F.3d 1471, 1474 n. 2 (Fed.Cir. 1997). The URAA was accompanied by a Statement of Administrative Action ("SAA"), H.R. Doc. No. 103–826(II), 103rd Cong. (2d Sess.1994), *reprinted in* 1994 U.S.C.C.A.N. 4040. Congress has instructed that

[t]he statement of administrative action approved by the Congress under [19 U.S.C. § 3511(a)] shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application.

19 U.S.C. § 3512(d); *see Micron Tech.,* 243 F.3d at 1309. Pertinent to this case, the SAA states:

Under . . . amended [19 U.S.C. § 1673b(a)], the Commission in preliminary investigations will determine whether there is a reasonable indication that imports are not negligible. The Commission's standard regarding negligible imports in preliminary investigations shall be the same as its standard for material injury determinations in these investigations, as set forth in *American Lamb Co. v. United States,* 785 F.2d 994 (Fed.Cir.1986). The amendments, however, are not intended to limit the Commission's ability to use reasonable estimates in calculating whether import volumes are negligible. The amendments are, however, intended to preclude termination based on negligibility in a preliminary investigation where, for example: (1) the Commission is uncertain regarding appropriate like product designations and corresponding import volumes are not negligible with respect to one of the arguable appropriate designations; or (2) imports are extremely close to the relevant quantitative thresholds and there is a reasonable indication that data obtained in a final investigation will establish that imports exceed the quantitative thresholds.

1994 U.S.C.C.A.N. at 4189.

In *American Lamb,* the case referenced in the SAA, three domestic lamb producers filed petitions with the Commission and Commerce, alleging that imports of lamb meat from New Zealand were being subsidized and then sold in the United States at less than fair value. *American Lamb,* 785 F.2d at 996. In due course, the Commission made a preliminary determination of

no material injury. *Id.* One of the domestic producers sought review of the negative preliminary determination in the Court of International Trade. It argued that the case should be remanded to the Commission because, in making its determination, the Commission had weighed conflicting evidence, contrary to the decision of the Court of International Trade in *Republic Steel Corp. v. United States*, 591 F.Supp. 640 (Ct. Int'l Trade 1984). In *Republic Steel*, the Court of International Trade remanded to the Commission two determinations in countervailing duty investigations because the Commission had weighed conflicting evidence in making a negative preliminary determination. In doing so, the court stated: "The object of [those] determinations should have been simply to find whether there were any facts which raised the possibility of injury. The resolution or interpretation of conflicting facts should have been reserved for a possible final injury determination." *Republic Steel*, 591 F.Supp. at 650. Thus, in *Republic Steel*, the Court of International Trade set forth the "possibility of injury" as the standard to be applied by the Commission in making a preliminary determination as to material injury.

In *American Lamb*, the Court of International Trade agreed with the domestic lamb producer that the Commission had improperly weighed conflicting evidence. Accordingly, it remanded the case in light of *Republic Steel*, instructing the Commission to reconsider the preliminary determination. *American Lamb*, 785 F.2d at 997. However, the court certified its order pursuant to 28 U.S.C. § 1292(d)(1) in order to allow the Commission to challenge the *Republic Steel* rule in the Federal Circuit on interlocutory appeal.

We granted the Commission's petition to accept the interlocutory appeal. Considering the case on the merits, we rejected the Court of International Trade's "possibility of injury" standard in the setting of a preliminary injury determination. We stated:

> [The Commission] has consistently viewed the statutory "reasonable indication" standard as one requiring that it issue a negative determination ... only when (1) the record as a whole contains clear and convincing evidence that there is no material injury or threat of such injury; and (2) no likelihood exists that contrary evidence will arise in a final investigation. That view, involving a process of weighing the evidence[,] but under guidelines requiring clear and convincing evidence of "*no* reasonable indication," and no likelihood of later contrary evidence, provides fully adequate protection against unwarranted terminations. Indeed, those guidelines weight the scales in favor of affirmative and against negative determinations.

*Id.* at 1001 (emphasis in original). Continuing, we stated that we were unable to join the Court of International Trade "in its view that the statutory phrase 'reasonable indication' means the same as mere 'possibility,' or that it suggests 'only the barest clues or signs needed to justify further inquiry.' The statute calls for a reasonable indication of injury, not a reasonable indication of need for further inquiry." *Id.* Accordingly, we overruled *Republic Steel* and remanded the case to the Court of International Trade with the instruction that the court vacate its decision in *American Lamb. Id.* at 1004.

## IV.

On appeal, Appellants and the Commission urge the reversal of the decision of the Court of International Trade in *Co–Steel II*. In doing so, they contend that the Court's remand in *Co–Steel I* was improper. They argue that the remand was contrary to the plain language of 19 U.S.C.

§ 1673b(a)(1) and that, under the standard of *Texas Crushed Stone,* the preliminary determination was rational and in accordance with law, and therefore should have been affirmed.

The Commission urges that "information available" in 19 U.S.C. § 1673b(a)(1) refers to information gathered within the forty-five day time period for conducting a preliminary investigation. In advancing this argument, the Commission points to our statement in *American Lamb* that "considering and weighing, under [Commission] guidelines, all evidence gathered within the 45 days available for conducting a preliminary investigation ... effectuates ... legislative intent." *Id.* at 1004. The Commission states that the Court of International Trade erred in not considering whether the Commission, at the time of the Preliminary Determination (i.e., October, 2001), had acted in a manner that was consistent with the *American Lamb* standard. It is the Commission's position that the Court of International Trade acted contrary to law in *Co–Steel I* by relying on Commerce's subsequent modification of the scope of the investigation.[7]

For its part, Co–Steel urges affirmance of *Co–Steel II.* Citing *American Lamb,* it argues that only if there is "clear and convincing" evidence to support the Commission's decision, and there is "no likelihood of later contrary evidence," can the Commission reach a negative preliminary determination. *Id.* at 1001. Co–Steel points out that there was evidence before the Commission that, during the relevant period, Venezuela's share of total imports of subject wire rod was 2.1%, while Egypt's was 1.4% and South Africa's was 2.6%, for a combined total of 6.1%. Co–Steel also points out that there was evidence before the Commission that Germany's share of the total amount of subject wire rod imports was 3.1%, putting it ex-tremely close to the three percent threshold for negligibility. Co–Steel argues that these facts, combined with the fact that the Commission was aware that Co–Steel had requested a scope modification, meant that, at the time of the preliminary determination, there was a reasonable indication that subject wire rod imports from Germany would be found negligible. This would mean that wire rod imports from Germany would be aggregated with those from Egypt, South Africa, and Venezuela, the result being that such wire rod imports from all four countries would exceed seven percent, so that imports from each country would be found non-negligible. Co–Steel asserts that, under these circumstances, it was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law for the Commission to determine that there was clear and convincing evidence that subject wire rod imports from Egypt, South Africa, and Venezuela were negligible and that no likelihood existed that such imports would be determined to be non-negligible in the final determination. Finally, Co–Steel contends that *Borlem S.A.-Empreedimentos Industriais v. United States,* 913 F.2d 933 (Fed.Cir. 1990), supports the Court of International Trade's reliance on Commerce's subsequent modification of the scope of the investigation.

In arguing that the preliminary determination was defective, Co–Steel does not renew the contention that was rejected in the Court of International Trade: that the Commission erred in basing its negligibility determination on data from the period August 2000 through July 2001. However, Co–Steel does urge that if we find the Court of International Trade erred in *Co–Steel I,* the proper course is to vacate *Co–Steel II* and remand the case so that the Court of International Trade can address

---

7. Alexandria and Sidor make arguments similar to those advanced by the Commission.

the issue of whether the Commission erred in concluding that there was no reasonable indication that wire rod imports from Egypt, South Africa, and Venezuela would imminently exceed the statutory threshold for negligibility. Co–Steel states: "The lower court did not address these issues given its decision finding error with respect to the *American Lamb* issue." Appellants and the Commission do not challenge that statement.

### V.

■ The antidumping statute states that the Commission is to make its preliminary determination "based on the information available to it at the time of the determination." 19 U.S.C. § 1673b(a)(1). That means that the Commission must render its preliminary determination "based on the information available to it" within the forty-five day period following the filing of an antidumping petition. *Id.* § 1673b(a)(2)(A)(i). "[T]he Commission will investigate the allegations in the petition in as thorough a manner as possible using the information available within that time period...." *American Lamb,* 785 F.2d at 1003 (quoting H.R.Rep. No. 96–317, at 61 (1979)).[8]

In the preliminary determination, the Commission concluded, for purposes of its material injury analysis, that wire rod imports from Egypt, South Africa, and Venezuela were negligible. In reaching that conclusion, the Commission noted that, based on end-use, Co–Steel had requested that Commerce modify the scope of the investigation to exclude from the investigation certain 1080 grade tire cord wire rod and certain 1080 grade tire bead wire rod. The Commission also noted Co–Steel's assertion that if Commerce modified the

scope of the investigation, wire rod imports from Germany would be negligible and thus would be aggregated with wire rod imports from Egypt, South Africa, and Venezuela, with the result that the seven percent aggregate threshold for negligibility would be exceeded. Preliminary Determination at 13, n. 41. At the same time, however, the Commission pointed out that Co–Steel acknowledged that the only record evidence regarding the effect of the proposed scope exclusion was "Petitioners' good faith estimate, based on their market knowledge and discussion with industry participants." *Id.* The Commission also pointed out that Co–Steel acknowledged in its October 9 request to Commerce that it was aware of Commerce's reluctance to rely on end-use to define scope coverage. *Id.* Under these circumstances, the Commission stated, "it is speculative that Commerce will amend the scope as Petitioners wish. Moreover, it is speculative that amending the scope will likely result in finding that no country's subject imports are negligible." *Id.* The Commission concluded:

> We make our negligibility determinations based on the scope and factual record before us, not speculation. We conclude that Petitioners' request to Commerce and their related assertions are not sufficient to conclude that contrary evidence to that already gathered on these issues, which soundly supports our negligibility determinations, would arise in any final phase of these investigations.

*Id.*

■ The Commission made its preliminary determination in a manner fully consistent with § 1673b(a)(1). The Com-

---

8. H.R.Rep. No. 96–317 is part of the legislative history relating to the Trade Agreements Act of 1979, Pub.L. No. 96–39, 93 Stat. 144 (1979). In the Trade Agreements Act, Congress adopted the "reasonable indication" standard for countervailing and antidumping preliminary investigations. *See American Lamb,* 785 F.2d at 1002.

mission rendered the preliminary determination in light of the facts as they existed at the time when the Commission was required to vote. It was not until April of 2002, six months later, that Commerce modified the scope of the investigation. We see no reason to fault the Commission for concluding that Co–Steel's eleventh-hour request to Commerce to change the scope of the investigation and the assertions in its October 9 letter to the Commission were insufficient to compel a preliminary determination of non-negligibility. The Commission's finding in the preliminary determination that imports of wire rod from Egypt, South Africa, and Venezuela were negligible was not arbitrary, capricious, an abuse of discretion, or contrary to law.

Relying on *American Lamb*, however, Co–Steel argues that "only if there is 'clear and convincing' evidence to support the Commission's decision, and there is '*no likelihood* of later contrary evidence,'" can the Commission reach a preliminary negative determination. *American Lamb*, 785 F.2d at 1001 (emphasis by Co–Steel). According to Co–Steel, its request that Commerce modify the scope of the antidumping investigation eliminated the possibility of the Commission concluding that there was "no likelihood" that evidence that imports of wire rod from Egypt, South Africa, and Venezuela were not negligible would "arise in a final investigation." *Id.*

We are not persuaded by this argument. We stated in *American Lamb* that the Commission "has consistently viewed the statutory 'reasonable indication' standard as one requiring that it issue a negative determination ... only when *the record as a whole* contains clear and convincing evidence that there is no material injury or threat of such injury." *Id.* (emphasis added) The "record as a whole" refers to the record at the time the Commission renders its preliminary determination in a case.

In our view, the fact that, three days before the Commission was to vote, Co–Steel asked Commerce to modify the scope of the investigation does not detract from the quantum or the quality of the evidence supporting the Commission's preliminary determination of negligibility at the time the Commission rendered the determination. We are not prepared to second-guess the Commission's refusal to view Co–Steel's October 9 letter as tipping the evidence of record toward a reasonable indication that data obtained in the final investigation would result in wire rod imports from Egypt, South Africa, and Venezuela being found not negligible. As we stated in *American Lamb*, a preliminary determination by the Commission involves "a process of weighing the evidence." *Id.* That is precisely what the Commission did in this case. As the record makes clear, it weighed the evidence before it at the time it rendered the preliminary determination Order.

We do not agree with Co–Steel that *Borlem* supports the Court of International Trade's consideration of evidence outside the record compiled during the forty-five day preliminary investigation, specifically, Commerce's modification of the scope of the investigation in April of 2002. In *Borlem*, the Budd Company filed antidumping petitions with Commerce and the Commission on behalf of the domestic industry producing tubeless steel disc wheel products ("TSDWs"). Budd alleged that Brazilian manufacturers were exporting TSDWs to the United States and selling them at less than fair value and that an industry in the United States was threatened with material injury. *Borlem*, 913 F.2d at 935. The only two Brazilian manufacturers were Borlem S.A.—Empreedimentos Industriais ("Borlem") and FNV—Veiculos E Equipamentos S.A. ("FNV"). *Id.* On March 13, 1987, Commerce made the final determination that less than fair

value dumping margins of 15.25% and 19.93% applied to Borlem and FNV, respectively. *Id.* Subsequently, the Commission determined that an industry in the United States was threatened with material injury by reason of the TSDW imports. *Id.* However, after that determination by the Commission, Commerce issued an antidumping duty order and an amendment to its final determination correcting certain clerical errors. *Id.*

Borlem and FNV challenged the final less than fair value determination by Commerce in the Court of International Trade. Subsequently, at the request of Commerce, the court remanded the final less than fair value determination and antidumping duty order to Commerce with the instruction that Commerce recalculate Borlem's and FNV's dumping margins and correct all clerical, methodological, and transcription errors. *Id.* The remand resulted in a second amended final less than fair value determination and an amended antidumping duty order finding Borlem to have a dumping margin of 10.84% and FNV a margin of 0.04%. *Id.* Commerce deemed FNV's margin *de minimis* and excluded it from its amended antidumping duty order. *Id.* In the Court of International Trade, Borlem and FNV also challenged the final injury determination by the Commission. *Id.* Eventually, at the request of the Commission, the Court of International Trade remanded the matter to the Commission pursuant to 28 U.S.C. § 2643(c)(1). The court instructed the Commission to decide whether it should reconsider its injury determination in light of Commerce's second-amended final determination. *Id.* at 935–36. In due course, the Commission reported to the court that, under the circumstances of the case, it did not have authority to reconsider its previous decision. *Id.* at 936. The Court of International Trade remanded the matter to the Commission once more, however, stating that the Commission had the power to exercise discre-

tion to reconsider its determination. Subsequently, we granted the Commission and the Budd Company interlocutory review of the Court of International Trade's second remand ruling. One of the two questions certified for interlocutory appeal, and the one pertinent to this case, was:

> whether or not the International Trade Commission has the authority and power to reconsider its final affirmative threat of injury determination, when directed to do so by [the Court of International Trade] pursuant to its remand authority under 28 U.S.C. § 2643(c)(1) in light of [Commerce's] amended final determination of sales at less than fair value and amended antidumping duty order.

*Id.*

Considering the merits, we held that the Court of International Trade had authority to remand the Commission's material injury determination. We stated:

> The remand authority given to the court by 28 U.S.C. § 2643(c)(1) demonstrates Congress' concern that the court have appropriate authority in trade cases to deal with the issues that come before it. The fact that, based on the second amended determination, FNV was shown not to be dumping beyond a *de minimis* amount was of sufficient importance that the Commission might have determined that there was no material injury or threat of injury at all. It is understandable and justifiable that the court might wish to remand such a case.
>
> A court is indeed obligated to give deference to an agency acting within its scope of responsibility. However, deference is not owed to a determination that is based on data that the agency generating those data indicates is incorrect. The law does not require, nor would it

make sense to require, reliance on data which might lead to an erroneous result. *Id.* at 937.

Co–Steel maintains that, in light of Commerce's modification of the scope of the investigation in April of 2002, *Borlem* supports the Court of International Trade's remand. Co–Steel misreads *Borlem.* As just seen, our decision in *Borlem* turned on the fact that the final injury determination that the Court of International Trade directed the Commission to reconsider was based upon an incorrect less than fair value determination by Commerce. *Id.* ("We agree with the trial court's interpretation of its powers and believe that Congress' desire for speedy determinations on dumping matters should not be interpreted as authorizing proceedings that are based on inaccurate data.") The critical difference between this case and *Borlem* is that the Commission's preliminary determination was not based on "inaccurate data." Rather, the scope of the investigation changed *after* the Commission issued the preliminary determination. We agree with the Commission that *Borlem* is distinguishable from this case.

We also agree with the Commission that *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), supports not extending *Borlem* to the facts of this case. In *Vermont Yankee,* the Supreme Court held that the District of Columbia Circuit had erred in overturning a decision of the Atomic Energy Commission ("AEC") granting a permit for the construction of a nuclear power plant. The D.C. Circuit's decision was based on theories of energy conservation alternatives that only came to be recognized as factors to be considered in granting a permit for the construction of a nuclear power plant after the agency decision at issue in the case. The Supreme Court held that the AEC's decision had to be judged by the information available to it at the time of its decision, not *post hoc* evolving notions of energy conservation alternatives to nuclear plants. *Id.* at 530–34, 536–37, 549–56, 98 S.Ct. 1197. The Court stated: "[T]he role of a court in reviewing the sufficiency of an agency's consideration of environmental factors is a limited one, limited both by the time at which the decision was made and by the statute mandating review." *Id.* at 555, 98 S.Ct. 1197. The rationale of *Vermont Yankee* runs counter to the Court of International Trade's consideration in this case of Commerce's modification of the scope of the antidumping investigation some six months after the preliminary determination. That is particularly so when one remembers that the Commission was under a statutory deadline of forty-five days to render its preliminary determination. The *Borlem* Court distinguished *Vermont Yankee,* stating "*Vermont Yankee* does not preclude remand where the decision under review rests on an erroneous fact." *Borlem,* 913 F.2d at 939. That distinction does not apply here, however. As seen above, the Commission's preliminary determination in this case was not based on "an erroneous fact."

We also think that the interest of finality of agency decisions is best served by not extending *Borlem* to the facts of this case. The Supreme Court stated in *Vermont Yankee* that if litigants could demand rehearing as a matter of law because of new circumstances, new trends or new facts, "there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening." *Vt. Yankee,* 435 U.S. at 554–55, 98 S.Ct. 1197 (quoting *ICC v. Jersey City,* 322 U.S. 503, 514, 64 S.Ct. 1129, 88 L.Ed. 1420 (1944)). We accept as true Co–Steel's assertion that when it asked Commerce to modify the scope of the antidumping investigation and then informed

the Commission of the request, it was acting in good faith. However, the fact remains that Co–Steel's request came very late in the day. The Commission was under a statutory mandate to render its decision within forty-five days of the date the original antidumping petitions were filed. When Co–Steel made its scope modification request, the Commission had completed its preliminary investigation, the Staff Report had been issued, and the members of the Commission were scheduled to vote on the preliminary determination in just three days. In addition, it was not until April of 2002 that Commerce actually modified the scope of the investigation. We find much force in the Commission's argument that if the Court of International Trade's decision in this case is upheld, future petitioners will be encouraged to make similar late-in-the-day scope modification requests to Commerce, and then argue before the Court of International Trade for remands and redeterminations based on new developments in the event a scope modification is made by Commerce. Under these circumstances, we cannot escape the conclusion that an affirmance of the decision of the Court of International Trade in this case would undermine the ability of the Commission to arrive at *final* preliminary determinations in antidumping cases.

## CONCLUSION

For the foregoing reasons, we hold that the Court of International Trade erred in *Co–Steel I* when it remanded the case to the Commission for further consideration in light of Commerce's modification of the scope of the investigation in April of 2002. Accordingly, we vacate the Court of International Trade's decision in *Co–Steel II*, which affirmed the Commission's Remand Determination. The case is remanded to the Court of International Trade for further proceedings. In those proceedings, the court will consider the contention in

Co–Steel's original motion for judgment on the administrative record that it did not address in *Co–Steel I*. That is the contention that the Commission erred in concluding in the preliminary determination that there was no reasonable indication that wire rod imports from Egypt, South Africa, and Venezuela would imminently exceed statutory negligibility levels, whether considered individually or collectively.

*VACATED and REMANDED.*

LOURIE, Circuit Judge, concurring in part and dissenting in part.

I agree with the thorough analysis set forth in the majority's opinion; however, I respectfully disagree with the majority's conclusion that the Court of International Trade properly exercised its jurisdiction in *Co–Steel II*. Although the Court of International Trade did not address its jurisdiction and the parties did not raise the issue on appeal, I believe that the Court of International Trade lacked jurisdiction to review the Commission's remand determination. I would therefore vacate the Court of International Trade's decision in *Co–Steel II* and remand with instructions to dismiss the appeal for lack of jurisdiction.

Judicial review in countervailing duty and antidumping duty proceedings is governed by 19 U.S.C. § 1516a. That statute provides that the Court of International Trade may review negative preliminary determinations, 19 U.S.C. § 1516a(a)(1) (2000), and any final determination, *id.* § 1516a(a)(2). *Tex. Crushed Stone Co. v. United States,* 35 F.3d 1535, 1539 n. 5 (Fed.Cir.1994). It does not, however, grant the Court of International Trade authority to review affirmative preliminary determinations. *See* 19 U.S.C. § 1516a(a)(1). Section 1516a(a)(1)(C), which addresses judicial review of preliminary determinations, specifically provides

that the Court of International Trade may review "a *negative* determination by the Commission, under section 1671b(a) or 1673b(a) of this title, as to whether there is reasonable indication of material injury, threat of material injury, or material retardation." *Id.* § 1516a(a)(1)(C) (emphasis added). There is no similar provision permitting judicial review of *affirmative* preliminary determinations.

In this case, the Commission initially made a negative preliminary determination as to whether there was a reasonable indication of material injury under 19 U.S.C. § 1673b(a), finding that imports of the subject merchandise from Egypt, South Africa, and Venezuela were negligible and terminating its investigation with respect to those countries. In *Co–Steel I*, the Court of International Trade properly exercised its jurisdiction under 19 U.S.C. § 1516a(a)(1)(C) to review that negative preliminary determination and remanded the case to the Commission. On remand, the Commission found that imports from Egypt, South Africa, and Venezuela were not negligible and, pursuant to 19 U.S.C. § 1673b(a), preliminarily determined that there was a reasonable indication that an industry in the United States was materially injured by imports of the subject merchandise. That was an affirmative preliminary determination. Nonetheless, in *Co–Steel II*, the Court of International Trade reviewed and expressly affirmed the Commission's remand determination. *Co–Steel II*, slip. op. at 13. I believe that it lacked jurisdiction to do so under the statutory scheme explained above.

My view is not inconsistent with the history of this case. The Commission's initial negative preliminary determination

terminated its antidumping investigation with respect to Egypt, South Africa, and Venezuela, ending all related proceedings before the Commission and making judicial review of the Commission's actions appropriate. In contrast, the Commission's later affirmative preliminary determination, which is what the Court of International Trade ultimately reviewed, did not terminate its investigation, but was only an intermediate stage in the Commission's ongoing investigation. *See Tex. Crushed Stone*, 35 F.3d at 1536–37 (explaining that a preliminary determination under 19 U.S.C. § 1673b(a) is only the second of five stages in an antidumping proceeding before the Commission). The appeal at that point was interlocutory because the administrative proceedings were not yet final: after the Commission made the affirmative preliminary determination, both it and the International Trade Administration ("ITA") were directed by statute to conduct further proceedings to determine whether an antidumping duty order should be issued. *See id.* The proper time for judicial review of the Commission's actions in this case would thus be upon the Commission's termination of its investigation at a later stage in the proceedings or upon its issuance of a final determination, for then its proceedings would be final.

The majority acknowledges that 19 U.S.C. § 1516a does not authorize judicial review of affirmative preliminary determinations, but concludes nonetheless that such review was appropriate in this case because the Commission's initial negative preliminary determination provided a basis for the Court of International Trade to "continue to adjudicate" the same case.* The statute, however, does not grant the

---

* The majority cites *Bingham & Taylor Division, Virginia Industries, Inc. v. United States,* 815 F.2d 1482 (Fed.Cir.1987), for the proposition that the Court of International Trade's initial review of a negative preliminary determina-

tion provides a jurisdictional basis for its review of a subsequent affirmative preliminary determination. In that case, however, the court did not address the issue of the Court of International Trade's jurisdiction.

Court of International Trade continuing jurisdiction to review chains of decisions; it limits that court's jurisdiction to review of specific determinations. *See* 19 U.S.C. § 1516a(a)(1) (2000) (subtitled "Review of certain determinations"). Indeed, once the Commission issued its remand determination, the negative preliminary determination ceased to exist and the current posture of the case was that the Commission had issued an affirmative preliminary determination, with continuing administrative proceedings yet to come. That was not the posture of the case when the decision appealed from was a negative preliminary determination. Thus, the Court of International Trade did not "continue to adjudicate" the Commission's negative preliminary determination in *Co–Steel II*. On the contrary, it reviewed only the Commission's affirmative preliminary determination, which it expressly affirmed. The fact that it was part of "the same case" stemming from "the same jurisdictional root" does not in my mind trump the explicit statutory criteria for jurisdiction in the Court of International Trade.

Accordingly, because I believe that the Court of International Trade lacked jurisdiction to review the Commission's remand determination, I would vacate the Court of International Trade's decision in *Co–Steel II* and remand with instructions to dismiss the appeal for lack of jurisdiction.